UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

11 CIV 5843

------------------------------------------------------------x
WILLIAM GILMAN,

                          Plaintiff,

            - against -

ELIOT SPITZER and THE SLATE GROUP, LLC,

                        Defendants.
------------------------------------------------------------x

Case No.
ECF Case

**COMPLAINT**
**JURY TRIAL DEMANDED**

RECEIVED
AUG 19 2011
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff William Gilman, by his attorneys Liddle & Robinson, L.L.P., alleges as follows:

## THE NATURE OF THE ACTION

       1.    This is a civil action for damages and remedies asserting a claim for defamation per se by libel against Eliot Spitzer ("Spitzer") and The Slate Group, LLC.

## JURISDICTION AND VENUE

       2.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.

       3.    Venue is proper in this district under 28 U.S.C. § 1391 because Defendants Eliot Spitzer and The Slate Group are located in this district.

## THE PARTIES

       4.    Plaintiff William Gilman ("Mr. Gilman") is an individual and resident of New Jersey. Mr. Gilman was an employee of Marsh & McLennan Companies, Inc. ("Marsh") from 1976 until approximately November 2, 2004.

       5.    Defendant The Slate Group, LLC ("The Slate Group") is a Delaware limited liability company. The Slate Group manages *Slate*.com, a daily magazine on the internet,

1

founded in 1996. The Slate Group is an online publishing entity created by the Washington Post Company to develop and manage web-only magazines. The Slate Group has offices and operates in both Washington, D.C. and New York.

6. Defendant Eliot Spitzer is the former New York Attorney General and is currently a columnist for The Slate Group on *Slate*.com. Mr. Spitzer resides in New York.

## THE FACTS

**A. Background**

7. Mr. Gilman has worked in the insurance industry for over 35 years. He worked for Marsh from 1976 to 2004.

8. Mr. Gilman was highly respected in the insurance industry. He was known to be extremely competent and to have a great deal of experience with excess liability insurance. Others in the insurance industry trusted Mr. Gilman regarding the placement of excess liability insurance. For several years, Mr. Gilman was responsible for a significant percentage of Marsh's annual profit.

9. In approximately May 2004, then-New York Attorney General Eliot Spitzer announced an investigation into Marsh's use of so-called contingent commissions.

10. Contingent commissions are fees paid by insurers to insurance brokers who place insurance business with the insurer. They are typically paid in addition to the regular commissions that insurance brokers receive from the insurer when the broker matches the insurer with a corporation that needs insurance coverage. Mr. Gilman's work for Marsh included negotiating contingent commissions.

11. Mr. Spitzer alleged in his investigation that contingent commissions were illegal, despite their wide-spread use in the industry and despite the fact that Marsh's clients were aware of the practice of contingent commissions and continued to utilize Marsh.

2

12. On October 14, 2004, Mr. Spitzer publically announced that he was filing a civil complaint against Marsh in connection with the use of contingent commissions ("the Marsh Complaint"). The Marsh Complaint alleged civil causes of action against Marsh for purportedly fraudulent business practices, antitrust violations, securities fraud, unjust enrichment, and common law fraud.

13. Marsh responded to the Marsh Complaint by replacing its Chief Executive Officer. That same day, Mr. Spitzer issued the following press release:

> The actions announced today by the Board of Directors of Marsh & McLennan Companies permits Marsh and [the New York Attorney General's] office to move forward toward a civil resolution of our lawsuit.
>
> We are persuaded that the goals that would have been advanced by a criminal prosecution of the corporation – punishment, restitution, general deterrence, and industry reform – will be better accomplished by criminal prosecution of individuals. . . .
>
> Realizing these goals, while also allowing Marsh & McLennan to retain a viable role in the marketplace, makes corporate criminal prosecution unnecessary.

Press Release, New York Attorney General, Statement by Attorney General Elliot Spitzer Regarding the Marsh & McLennan Companies (Oct. 25, 2005).

14. Three months later, on January 30, 2005, Marsh and Mr. Spitzer entered into an agreement to resolve the Marsh Complaint. The agreement required Marsh to pay $850 million over the course of four years to customers to reimburse them for certain premiums they had paid. Marsh also agreed to make certain changes to their business practices including no longer accepting contingent commissions.

15. Approximately nine months later, on September 15, 2005, the New York Attorney General's office announced an indictment against Mr. Gilman and seven others, charging him with 37 counts in connection with Mr. Spitzer's investigation.

16. After an 11-month bench trial before New York Supreme Court Justice James A. Yates, Mr. Gilman and his co-Defendant Edward McNenney were acquitted of all but one of the charges brought against them.[1] On February 20, 2008, Mr. Gilman and Mr. McNenney were each convicted of one count of Restraint of Trade & Competition.

17. In October of 2009, Justice Yates acquitted three other former Marsh executives on charges of bid-rigging and price-fixing after an 11-month trial. Former managing directors Joseph Peiser and Kathleen Drake and former Senior Vice President Greg Doherty were found not guilty by the Court of grand larceny, scheming to defraud, and antitrust violations under the general business law.

18. It was revealed during the trial of Mr. Peiser, Ms. Drake and Mr. Doherty that 700,000 pages of exculpatory documents and exculpatory deposition testimony of key witnesses had not been disclosed to Mr. Gilman and Mr. McNenney during their trial. As a result, on July 2, 2010, Justice Yates vacated his own verdict convicting Mr. Gilman and Mr. McNenney, finding that "the newly discovered contradictory evidence undermines the Court's confidence in the verdict." *People of the State of New York v. Gilman*, Case No. 4800-2009, 28 Misc.3d 1217(A), 2010 N.Y. Slip. Op. 51379(U), at 25 (N.Y. Sup. Ct. July 2, 2010). The Court indicated that "the verdict here rested firmly upon the testimony of [six witnesses], and yet, each one of them, after testifying with very favorable cooperation agreements, has, at times, before, during, or shortly after trial, given sworn testimony discrediting, even

---

[1] Thirteen counts of Grand Larceny from the indictment were dismissed against Mr. Gilman and Mr. McNenney prior to trial.

4

contradicting, their trial testimony." *Id.* at 25. "[T]aken as a whole, the evidence raises not only a possibility, but a probability that its disclosure would have produced a different result." *Id.* at 24. Also based on the vast amount of exculpatory evidence and the results of the trials against the other former Marsh employees, in early 2010, Justice Yates dismissed charges against two additional Marsh executives prior to trial.

19. Prior to the dispositions of the trial against Mr. Gilman, Mr. McNenney, Mr. Peiser, Ms. Drake, and Mr. Dougherty, approximately 21 people had pled guilty to various misdemeanor and felony offenses in connection with Mr. Spitzer's investigation of Marsh. Almost all were allowed to withdraw their pleas and receive adjournments in contemplation of dismissal, a non-criminal disposition that results in dismissal of the charges after six months, or outright dismissal of the charges. Even among the few that did receive criminal dispositions, the Court imposed a sentence of an unconditional discharge, a conviction without punishment. No person charged with a crime in connection with Mr. Spitzer's investigation of Marsh received a sentence that included incarceration.

20. On January 13, 2011, the New York Attorney General's office, then led by Attorney General Eric Schneiderman, dismissed the remaining charge against Mr. Gilman and Mr. McNenney. Dismissing the charges against Mr. Gilman and Mr. McNenney was one of Mr. Schneiderman's first official acts as Attorney General. All criminal charges brought against Mr. Gilman and Mr. McNenney were resolved in their favor.[2]

**B.    Mr. Spitzer Authored an Article, Published on *Slate*.com, Containing False and Defamatory Statements Concerning Mr. Gilman**

21. Despite Mr. Gilman's innocence, and the fact that all allegations against him had been resolved in his favor, Mr. Spitzer, now a member of the media and no longer a

---

[2]    Messrs. Gilman and McNenney were initially sentenced to 16 weekends of incarceration but that sentence was vacated by the Court and never served.

public official, published false and defamatory charges regarding Mr. Gilman on the internet accusing him a second time of criminal conduct.

22. The week prior to Mr. Spitzer's defamation, on August 13, 2010, the *Wall Street Journal* published an editorial article highly critical of Mr. Spitzer's handling of the Marsh investigation and of the prosecution of Mr. Gilman and Mr. McNenney. The article states:

> One would think that Mr. Cuomo would want to end the era of stonewalling [related to AIG], especially after the defeat his office sustained last month on still another Spitzer-created prosecution. Manhattan Supreme Court Justice James A. Yates vacated the felony convictions of two former employees of Marsh & McLennan Companies because the Attorney General's office had failed to turn over potentially exculpatory evidence to the defense.
>
> Although prosecutors had earlier assured the court that "We don't want to be accused of hiding anything," Judge Yates found that the Attorney General's office had failed to turn over more than 700,000 pages of documents, plus deposition testimony from key witnesses.
>
> Once the evidence came to light, defense lawyers argued that many of the documents directly contradicted the testimony of government witnesses at trial, and Judge Yates appears to agree. "While each item of evidence taken individually may present a reasonable possibility that the verdict would have been different, taken as a whole, the evidence raises not only a possibility, but a probability that its disclosure would have produced a different result," he said."

*Eliot Spitzer's Last Admirer*, WALL STREET JOURNAL, Aug. 13, 2010, at A16.

23. Thereafter, on August 22, 2010, on *Slate*.com, The Slate Group published an article written by Mr. Spitzer in which he responded to the August 13, 2010 *Wall Street Journal* editorial article.

24. Mr. Spitzer's article is titled "They Still Don't Get It." A print-out of the article by Mr. Spitzer is attached as Exhibit A. The article is patently false and defamatory to Mr. Gilman in several respects. Mr. Spitzer indicates that Mr. Gilman is guilty of crimes, even

6

crimes he was never accused of, despite the fact that his conviction had been vacated and that Justice Yates indicated, with the vast amounts of exculpatory evidence "would have produced a different result." While Mr. Spitzer's article does not name Mr. Gilman specifically, it is clear from the context that Mr. Spitzer is referring to Mr. Gilman.

25. The sentences from Mr. Spitzer's article prior to the defamatory quotes in paragraphs 27 to 32 below, highlight Mr. Gilman. Mr. Spitzer's article states that "[t]he [*Wall Street Journal*] editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted. The judge found that certain evidence that should have been turned over to the defense was not. (The cases were tried after my tenure as attorney general.)" Anyone that followed the cases in the newspaper, or was aware of the charges against Marsh and its employees at all could readily identify Mr. Gilman as one of the two employees at issue. Indeed, any person with internet access can easily determine that Mr. Gilman and Mr. McNenney were the two former Marsh employees who had their convictions vacated, and, thus, that Mr. Spitzer was referring to Mr. Gilman in his defamatory statements.

26. Furthermore, public records still exist regarding the trials of Mr. Gilman and Mr. McNenney and the order vacating their convictions based on undisclosed exculpatory evidence. While Mr. Spitzer did not use his name, it is obvious to the public that Mr. Spitzer was referring to Mr. Gilman in his defamatory statements. That Mr. Spitzer was referring to Mr. Gilman was certainly obvious to, and harmed Mr. Gilman in, the insurance industry and any other part of the public observing the events related to Marsh.

27. In the August 22, 2011 article, Mr. Spitzer defames Mr. Gilman by stating:

> "Unfortunately for the credibility of the [*Wall Street*] *Journal*, the editorial fails to note the *many employees of Marsh* who have been

7

convicted and *sentenced to jail terms*." (Emphasis added.)

28.     Contrary to Mr. Spitzer's statements, no Marsh employees were sentenced to jail terms, particularly not Mr. Gilman as all of the charges against him were dismissed or vacated. As such, Mr. Gilman has not faced any sentence at all. At the time Mr. Spitzer made these statements, he knew that Mr. Gilman, as well as his fellow Marsh employees who went to trial, had been acquitted of the charges made against them. Mr. Spitzer was also well aware of the outcomes of the other cases against Marsh employees, all of which were resolved with dismissals or sentences of an unconditional discharge. No Marsh employee was sentenced to incarceration.

29.     Mr. Spitzer's defamation continues in the article. Mr. Spitzer goes on to state that:

> "*Marsh's behavior was a blatant abuse of law* and market power: *price-fixing, bid-rigging, and kickbacks* all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks." (Emphasis added.)

30.     However, Marsh's behavior with respect to contingent commissions and otherwise, and Mr. Gilman's behavior in particular, was not illegal. All of the criminal allegations resulted in acquittals, dismissals, or unconditional discharges, including the allegations against Mr. Gilman. Also, in early 2010, the New York Attorney General even gave Marsh permission to use contingent commissions again despite a settlement agreement with the New York Attorney General where Marsh agreed not to do so. There was nothing illegal about any of the actions alleged by the New York Attorney General.

31.     The same statement by Mr. Spitzer was false and defamatory because, contrary to his assertions, no customers were harmed by Mr. Gilman's actions. Mr. Spitzer, however, falsely stated:

8

> "Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks *all designed to harm their customers and the market* while Marsh and its employees pocketed the increased fees and kickbacks." (Emphasis added.)

32. Most egregiously, Mr. Spitzer's also falsely alleges that Mr. Gilman and his fellow employees "pocketed the increased fees and kickbacks" related to contingent commissions. Mr. Spitzer falsely states:

> "Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while *Marsh and its employees pocketed the increased fees and kickbacks*." (Emphasis added.)

33. In fact, no employee profited from the use of contingent commissions in any way, nor from any of the actions allegedly committed by Mr. Gilman. As Mr. Spitzer is undoubtedly aware, neither he nor the subsequent attorneys general ever even alleged that Mr. Gilman or any other Marsh employee profited from the alleged scheme or, in any way, took kickbacks.

34. Mr. Spitzer's statement about employees pocketing fees and kickbacks is patently false and was never even an allegation made against a single Marsh employee.

35. While Mr. Spitzer's statements do not refer to Mr. Gilman by name and, instead, refer generically to "many employees of Marsh," Mr. Gilman is readily identifiable as the subject of the defamatory comments.

36. Mr. Spitzer made these statements with actual malice towards Mr. Gilman. Mr. Spitzer was well aware of his own allegations as Attorney General and the resolution of those allegations in favor of Mr. Gilman and yet, recklessly disregarded these facts.

37. Further, any amount of fact checking would have revealed to The Slate Group that the statements of Mr. Spitzer in his August 22, 2011 article were false. The Slate Group knew or should have known Mr. Spitzer's statements were false.

9

38. The statements against Mr. Gilman are defamatory per se in that they tended to injure Mr. Gilman in his trade, business, or profession and accused him of criminal activity.

39. Mr. Spitzer's defamatory statements were published in that they were communicated to the public via *Slate*.com with links to the article from *Slate*.com's main page. The article is also easily discoverable through Google searches regarding the events that Spitzer wrongly describes.

40. As a consequence of Mr. Spitzer's false statements, Plaintiff has suffered general damages, including but not limited to, damage to his reputation.

## FIRST CLAIM FOR RELIEF
### (Defamation Per Se By Libel)

41. Plaintiff repeats and realleges the allegations contained in paragraphs 1-40, as if separately set forth herein.

42. Defendants published, and caused to be published, false and damaging statements concerning Mr. Gilman. Defendants' libel is permanent and can never be undone. Defendants published the libel on the internet through *Slate*.com.

43. Mr. Spitzer's statements, through *Slate*.com, are defamatory per se in that they accuse Mr. Gilman of criminal conduct and injure him in his trade, business, and profession. Mr. Spitzer is now a member of the media and is no longer protected by sovereign immunity.

44. Before publishing the article by Mr. Spitzer, The Slate Group should have known that the assertions were false and misleading and The Slate Group was reckless as to the truth of the statements. Thus both Mr. Spitzer and The Slate Group acted with actual malice in publishing Mr. Spitzer's article, to wit, this reckless disregard of the truth.

45. As a consequence of the publication of Mr. Spitzer's false statements, Mr. Gilman has suffered economic injury, and continues to suffer damages, including but not limited to, damage to his reputation.

46. By reason of the foregoing, both The Slate Group and Mr. Spitzer are liable to Mr. Gilman for actual, special, compensatory, general, and punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. On the claim for defamation per se, damages, including actual, special, and compensatory damages of at least $10,000,000, general damages of at least $20,000,000, and punitive damages of at least $30,000,000 plus costs, interest, and attorneys' fees; and

B. Such other and further relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:     New York, New York
           August 19, 2011

                              LIDDLE & ROBINSON, L.L.P.

                              By: _____
                                  Jeffrey L. Liddle
                                  James W. Halter
                              800 Third Avenue
                              New York, NY 10022
                              *Attorneys for Plaintiff*

# EXHIBIT A

# Slate

## They Still Don't Get It
Some people on Wall Street, and at the Wall Street Journal, speak as if the financial crisis never happened.

*By Eliot Spitzer*

Posted Sunday, Aug. 22, 2010, at 7:03 AM ET



The art of the "big lie" is to repeat something often enough, and with a powerful enough megaphone, such that your distortions are not challenged. So it is with the *Wall Street Journal*'s obsession with attacking and misrepresenting the multiple cases that I brought against both AIG and its former chairman and CEO, Hank Greenberg.

At stake is much more than the particular cases at issue. By trying to rewrite the narrative of the economic cataclysm we have lived through, the deniers are attempting to challenge the common-sense conclusions that flow from an accurate understanding of history. They are desperately trying to protect a particularly rabid, and ultimately damaging, anti-regulatory philosophy that has dominated the past 30 years. They are trying to protect a broken and misguided understanding of how markets really function, a view now openly rejected even by such staunch free-market advocates as Judge Richard Posner and former Fed Chairman Alan Greenspan. Acknowledging the propriety of any government prosecutions of corporate wrongdoing would make impossible their current effort to push back against even the government's minimal responses to the financial crisis.

So, in view of the *Journal*'s recent editorial, a few facts are in order: Greenberg was removed as CEO of AIG by his own board—of its own volition—after

Advertisement

his refusal to answer questions about his involvement in fraudulent reinsurance contracts that his company had created. Five people were convicted by a jury in Connecticut in 2008 for their role in these frauds. The federal prosecutor, in his summation, called Greenberg an unindicted co-conspirator in the scheme. In New York, the judge who will hear the case based on these facts, brought by the state when I was attorney general, called the case "devastating" and referred to AIG as a "criminal enterprise." AIG as a corporate entity settled the case with my office in 2006 by restating its financial results and paying a fine of $1.6 billion. Shareholders are now awaiting judicial approval of an additional $750 million settlement to compensate them for damages they suffered from these accounting frauds.

Contrary to the claims of the *Journal*'s editorial, the cases against Greenberg and AIG have been both proper and successful. More to the point, perhaps, they have been necessary to the vindication of justice and ethics in the marketplace.

The *Journal*'s editorial also seeks to disparage the cases my office brought against Marsh & McLennan for a range of financial and business crimes. The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted. The judge found that certain evidence that should have been turned over to the defense was not. (The cases were tried after my tenure as attorney general.) Unfortunately for the credibility of the *Journal*, the editorial fails to note the many employees of Marsh who have been convicted and sentenced to jail terms, or that Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks. Marsh as a company paid an $850 million fine to resolve the claims and brought in new leadership. At the time of the criminal conduct, Jeff Greenberg, Hank Greenberg's son, was the CEO of Marsh. He was forced to resign.

What does it mean that supposedly thoughtful voices in the corporate world continue to deny the simple fact that irresponsible behavior should be addressed head on, and the rules of conduct altered sufficiently to permit a sound foundation for future economic growth?

I fear that we have still not constructed a social contract or general understanding of the role of government in the marketplace that will bring things into balance—in terms of both individual behavior and collective responsibility.

Advertisement

Maybe we are still living in the remaining hours of a fading regime, still addled by the warped perspective of too many who have done perhaps too well over the past decade or two. A case in point is Steve Schwarzman, the founder and CEO of Blackstone, a private equity firm. Schwarzman recently compared the attempt to tax the often astronomical fees earned by private equity managers as ordinary income—as they should be—to Hitler's invasion of Poland. This horrific statement, from someone who spent millions of dollars on his own birthday party, is an unfortunate reminder of the mind-set of at least some pockets of our corporate leadership. It is time for more enlightened voices in the corporate world to use their own megaphones.

*Like **Slate** on Facebook. Follow us on Twitter.*

*Like **Slate** on Facebook. Follow us on Twitter.*

Advertisement