**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**WILLIAM GILMAN,**

           **Plaintiff/Counterclaim Defendant,**              No. 11 Civ 5843 (JPO)
                                                              **ECF Case**
**v.**

**ELIOT SPITZER and THE SLATE GROUP, LLC,**

           **Defendants/Counterclaimants.**

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF DEFENDANTS/COUNTERCLAIMANTS ELIOT SPITZER AND THE SLATE GROUP, LLC

Defendants/Counterclaimants Eliot Spitzer and The Slate Group, LLC (collectively, "Defendants"), by and through the undersigned counsel, hereby submit this Answer, Affirmative Defenses, and Counterclaim in response to the Complaint of Plaintiff/Counterclaim Defendant William Gilman as follows:

### THE NATURE OF THE ACTION

1.      This is a civil action for damages and remedies asserting a claim for defamation per se by libel against Eliot Spitzer ("Spitzer") and The Slate Group.

**RESPONSE:**  Defendants admit the allegations contained in paragraph 1 of the Complaint.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000.

**RESPONSE:**  Defendants admit that this Court has jurisdiction over the subject matter of this action.

3.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendants Eliot Spitzer and The Slate Group are located in this district.

**RESPONSE:**  Defendants admit that venue is proper in this judicial district.

## THE PARTIES

4.     Plaintiff William Gilman ("Mr. Gilman") is an individual and resident of New Jersey.  Mr. Gilman was an employee of Marsh & McLennan Companies, Inc. ("Marsh") from 1976 until approximately November 2, 2004.

**RESPONSE:**  On information and belief, Defendants admit the allegations contained in paragraph 4 of the Complaint.

5.     Defendant The Slate Group, LLC ("The Slate Group") is a Delaware limited liability company.  The Slate Group manages *Slate*.com, a daily magazine on the internet, founded in 1996.  The Slate Group is an online publishing entity created by The Washington Post Company to develop and manage web-only magazines.  The Slate Group has offices and operates in both Washington, D.C. and New York.

**RESPONSE:**  Defendants admit the allegations contained in paragraph 5 of the Complaint.

6.     Defendant Eliot Spitzer is the former New York Attorney General and is currently a columnist for The Slate Group on *Slate*.com.  Mr. Spitzer resides in New York.

**RESPONSE:**  Defendants admit the allegations contained in paragraph 6 of the Complaint.

## THE FACTS

7.      Mr. Gilman has worked in the insurance industry for over 35 years.  He worked for Marsh from 1976 to 2004.

**RESPONSE:**  On information and belief, Defendants admit the allegations contained in paragraph 7 of the Complaint.

8.      Mr. Gilman was highly respected in the insurance industry.  He was known to be extremely competent and to have a great deal of experience with excess liability insurance.  Others in the insurance industry trusted Mr. Gilman regarding the placement of excess liability insurance.  For several years, Mr. Gilman was responsible for a significant percentage of Marsh's annual profit.

**RESPONSE:**  Defendants admit that others in the insurance industry placed their trust in Mr. Gilman and that, in certain years, Mr. Gilman was responsible for a significant percentage of Marsh's annual profit.  Defendants deny the remaining allegations contained in paragraph 8 of the Complaint.

9.      In approximately May 2004, then-New York Attorney General Eliot Spitzer announced an investigation into Marsh's use of so-called contingent commissions.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 9 of the Complaint.

10.      Contingent commissions are fees paid by insurers to insurance brokers who place insurance business with the insurer.  They are typically paid in addition to the regular commissions that insurance brokers receive from the insurer when the broker matches the insurer with a corporation that needs insurance coverage.  Mr. Gilman's work for Marsh included negotiating contingent commissions.

**RESPONSE:**  Defendants admit that, in the January 30, 2005, settlement agreement between the Attorney General of the State of New York and the Superintendent of Insurance of the State of New York and Marsh & McLennan Companies, Inc., Marsh Inc. and their subsidiaries and affiliates ("the Marsh entities"), the term "contingent commissions" is defined as compensation from insurers to insurance brokers that is contingent upon the broker a) placing a particular number of policies or dollar value of premium with the insurer, b) achieving a particular level of growth in the number of policies placed or dollar value of premium with the insurer, c) meeting a particular rate of retention or renewal of policies in force with the insurer, d) placing or keeping sufficient insurance business with the insurer to achieve a particular loss ratio or any other measure of profitability, or e) providing preferential treatment in the placement process, including but not limited to the giving of last looks, first looks, rights of first refusal, or limiting the number of quotes sought from insurers for insurance placements.  Defendants further admit that Mr. Gilman's work for Marsh included negotiating the payment of contingent commissions by insurers.  Defendants deny the remaining allegations contained in paragraph 10 of the Complaint.

11.     Mr. Spitzer alleged in his investigation that contingent commissions were illegal, despite their wide-spread use in the industry and despite the fact that Marsh's clients were aware of the practice of contingent commissions and continued to utilize Marsh.

**RESPONSE:**  Defendants deny that the State of New York or Mr. Spitzer alleged that contingent commissions were illegal *per se* and further deny that Marsh's clients were aware of the practice of contingent commissions and continued to utilize Marsh.  Defendants admit the remaining allegations contained in paragraph 11 of the Complaint.

12.     On October 14, 2004, Mr. Spitzer publically [*sic*] announced that he was filing a civil complaint against Marsh in connection with the use of contingent commissions ("the Marsh Complaint").  The Marsh Complaint alleged civil causes of action against Marsh for purportedly fraudulent business practices, antitrust violations, securities fraud, unjust enrichment, and common law fraud.

**RESPONSE:**  Defendants admit that, on October 14, 2004, Mr. Spitzer publicly announced that the State of New York was filing a civil complaint against Marsh.  With respect to the content of the Marsh Complaint, Defendants aver that the document speaks for itself.

13.     Marsh responded to the Marsh Complaint by replacing its Chief Executive Officer.  That same day, Mr. Spitzer issued the following press release:

> The actions announced today by the Board of Directors of Marsh & McLennan Companies permits Marsh and [the New York Attorney General's] office to move forward toward a civil resolution of our lawsuit.
>
> We are persuaded that the goals that would have been advanced by a criminal prosecution of the corporation — punishment, restitution, general deterrence, and industry reform — will be better accomplished by criminal prosecution of individuals. . . .
>
> Realizing these goals, while also allowing Marsh & McLennan to retain a viable role in the marketplace, makes corporate criminal prosecution unnecessary.

Press Release, New York Attorney General, Statement by Attorney General [Eliot] Spitzer Regarding the Marsh & McLennan Companies (Oct. 25, 2005).

**RESPONSE:**  Defendants deny that the press release was issued in 2005 and that the quoted language reflects the whole of the October 25, 2004, press release issued by then–Attorney General Spitzer, which press release speaks for itself.  Defendants admit that Marsh

replaced its Chief Executive Offer on October 25, 2004, and deny the remaining allegations

contained in paragraph 13 of the Complaint.

14.     Three months later, on January 30, 2005, Marsh and Mr. Spitzer entered

into an agreement to resolve the Marsh Complaint.  The agreement required Marsh to pay $850

million over the course of four years to customers to reimburse them for certain premiums they

had paid.  Marsh also agreed to make certain changes to their business practices including no

longer accepting contingent commissions.

**RESPONSE:**  Defendants admit that, on January 30, 2005, the Marsh entities entered

into a settlement agreement with the Attorney General of the State of New York and the

Superintendent of Insurance of the State of New York, in which the Marsh entities agreed, *inter*

*alia*, to pay $850 million dollars over the course of four years to its policyholder clients who

retained Marsh to place, renew, consult on or service insurance where such placement resulted in

contingent commissions or overrides.  Defendants further admit that the Marsh entities also

agreed to undertake certain business reforms, including an agreement prohibiting it from directly

or indirectly accepting from or requesting of any insurer any compensation contingent upon

Marsh's a) placing a particular number of policies or dollar value of premium with the insurer, b)

achieving a particular level of growth in the number of policies placed or dollar value of

premium with the insurer, c) meeting a particular rate of retention or renewal of policies in force

with the insurer, d) placing or keeping sufficient insurance business with the insurer to achieve a

particular loss ratio or any other measure of profitability, e) providing preferential treatment in

the placement  process, including but not limited to the giving of last looks, first looks, rights of

first refusal, or limiting the number of quotes sought from insurers for insurance placements, or

f) obtaining anything else of material value for the insurer.  Defendants deny the remaining allegations contained in paragraph 14 of the Complaint.

15.     Approximately nine months later, on September 15, 2005, the New York Attorney General's office announced an indictment against Mr. Gilman and seven others, charging him with 37 counts in connection with Mr. Spitzer's investigation.

**RESPONSE:**  Defendants admit the allegations contained in paragraph 15 of the Complaint.

16.     After an 11-month bench trial before New York Supreme Court Justice James A. Yates, Mr. Gilman and his co-Defendant Edward McNenney were acquitted of all but one of the charges brought against them.[FN1]  On February 20, 2008, Mr. Gilman and Mr. McNenney were each convicted of one count of Restraint of Trade & Competition.

[FN1]  Thirteen counts of Grand Larceny from the indictment were dismissed against Mr. Gilman and Mr. McNenney prior to trial.

**RESPONSE:**  Defendants admit that, after a bench trial before New York Supreme Court Justice James A. Yates, Mr. Gilman and his co-defendant Edward McNenney were convicted of the crime of Combination in Restraint of Trade and Competition in violation of the Donnelly Act, New York's antitrust statute.  Defendants deny the remaining allegations contained in paragraph 16 of the Complaint, except to admit that Mr. Gilman and Mr. McNenney were also charged with the crime of Scheme to Defraud in the First Degree and thirty-five counts of Grand Larceny, each of which was based on a separate excess casualty insurance placement transaction; that the People voluntarily elected not to prosecute thirteen of the indicted Grand Larceny counts; and that Justice Yates dismissed three Grand Larceny counts and acquitted Mr. Gilman and Mr. McNenney of the Scheme to Defraud and remaining Grand Larceny counts.

17.     In October of 2009, Justice Yates acquitted three other former Marsh executives on charges of bid-rigging and price-fixing after an 11-month trial.  Former managing directors Joseph Peiser and Kathleen Drake and former Senior Vice President Greg Doherty were found not guilty by the Court of grand larceny, scheming to defraud, and antitrust violations under the general business law.

**RESPONSE:**  Defendants admit that former Marsh managing directors Joseph Peiser and Kathleen Drake, and former Marsh Senior Vice President Greg Doherty were indicted on charges of Scheme to Defraud in the First Degree, Combination in Restraint of Trade and Competition in violation of the Donnelly Act, and Grand Larceny and that Justice Yates acquitted them of these charges in October 2009 after a trial lasting approximately 11 months. Defendants deny the remaining allegations contained in paragraph 17 of the Complaint.

18.     It was revealed during the trial of Mr. Peiser, Ms. Drake and Mr. Doherty that 700,000 pages of exculpatory documents and exculpatory deposition testimony of key witnesses had not been disclosed to Mr. Gilman and Mr. McNenney during their trial.  As a result, on July 2, 2010, Justice Yates vacated his own verdict convicting Mr. Gilman and Mr. McNenney, finding that "the newly discovered contradictory evidence undermines the Court's confidence in the verdict."  *People of the State of New York v. Gilman,* Case No. 4800-2009, 28 Misc.3d 1217(A), 2010 N.Y. Slip. Op. 51379(U), at 25 (N.Y. Sup. Ct. July 2, 2010). The Court indicated that "the verdict here rested firmly upon the testimony of [six witnesses], and yet, each one of them, after testifying with very favorable cooperation agreements, has, at times, before, during, or shortly after trial, given sworn testimony discrediting, even contradicting, their trial testimony."  *Id.* at 25.  "[T]aken as a whole, the evidence raises not only a possibility, but a probability that its disclosure would have produced a different result."  *Id.*

at 24.  Also based on the vast amount of exculpatory evidence and the results of the trials against

the other former Marsh employees, in early 2010, Justice Yates dismissed charges against two

additional Marsh executives prior to trial.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 18 of the

Complaint, particularly those that misquote, miscite, and mischaracterize the July 2, 2010, order

issued by Justice Yates, in the matter of *People of the State of New York v. Gilman,*

No. 4800/2009, 28 Misc.3d 1217(A) (N.Y. Sup. Ct. N.Y. Cnty. July 2, 2010).  Defendants aver

that the opinion issued by Justice Yates speaks for itself, and Defendants respectfully refer to the

Court to that opinion for its contents.

19.     Prior to the dispositions of the trial against Mr. Gilman, Mr. McNenney,

Mr. Peiser, Ms. Drake, and Mr. Dougherty, approximately 21 people had pled guilty to various

misdemeanor and felony offenses in connection with Mr. Spitzer's investigation of Marsh.

Almost all were allowed to withdraw their pleas and receive adjournments in contemplation of

dismissal, a non-criminal disposition that results in dismissal of the charges after six months, or

outright dismissal of the charges.  Even among the few that did receive criminal dispositions, the

Court imposed a sentence of an unconditional discharge, a conviction without punishment.  No

person charged with a crime in connection with Mr. Spitzer's investigation of Marsh received a

sentence that included incarceration.

**RESPONSE:**  Defendants admit that 21 Marsh and insurance carrier executives pleaded

guilty to violating the Donnelly Act and/or to participating in a Scheme to Defraud in the First

Degree, that many of them were subsequently permitted to withdraw their pleas and receive

adjournments in contemplation of dismissal, and that others received criminal dispositions.

Defendants deny the remaining allegations contained in paragraph 19 of the Complaint.

20.     On January 13, 2011, the New York Attorney General's office, then led by Attorney General Eric Schneiderman, dismissed the remaining charge against Mr. Gilman and Mr. McNenney.  Dismissing the charges against Mr. Gilman and Mr. McNenney was one of Mr. Schneiderman's first official acts as Attorney General.  All criminal charges brought against Mr. Gilman and Mr. McNenney were resolved in their favor.[FN2]

[FN2]  Messrs. Gilman and McNenney were initially sentenced to 16 weekends of incarceration but that sentence was vacated by the Court and never served.

**RESPONSE:**  Defendants admit that Justice Yates sentenced Mr. Gilman and Mr. McNenney to 16 weekends in jail and five years' probation with 250 hours of community service; that the office of the New York Attorney General, on January 11, 2011, moved the court to dismiss the indictment against Mr. Gilman and Mr. McNenney because the office "concluded that it would not be an efficient use of [the] office's resources to pursue [the] matter"; and that the sentences were never served.  Defendants are without knowledge or information sufficient to form a belief as to whether dismissing the indictment was one of Attorney General Schneiderman's first official acts as Attorney General and therefore deny the allegation. Defendants deny the remaining allegations contained in paragraph 20 of the Complaint.

21.     Despite Mr. Gilman's innocence, and the fact that all allegations against him had been resolved in his favor, Mr. Spitzer, now a member of the media and no longer a public official, published false and defamatory charges regarding Mr. Gilman on the internet accusing him a second time of criminal conduct.

**RESPONSE:**  Defendants admit that Mr. Spitzer is no longer a public official and deny the remaining allegations contained in paragraph 21 of the Complaint.

22. The week prior to Mr. Spitzer's defamation, on August 13, 2010, the *Wall Street Journal* published an editorial article highly critical of Mr. Spitzer's handling of the Marsh investigation and of the prosecution of Mr. Gilman and Mr. McNenney. The article states:

> One would think that Mr. Cuomo would want to end the era of stonewalling [related to AIG], especially after the defeat his office sustained last month on still another Spitzer-created prosecution. Manhattan Supreme Court Justice James A. Yates vacated the felony convictions of two former employees of Marsh & McLennan Companies because the Attorney General's office had failed to turn over potentially exculpatory evidence to the defense.
>
> Although prosecutors had earlier assured the court that "We don't want to be accused of hiding anything," Judge Yates found that the Attorney General's office had failed to turn over more than 700,000 pages of documents, plus deposition testimony from key witnesses.
>
> Once the evidence came to light, defense lawyers argued that many of the documents directly contradicted the testimony of government witnesses at trial, and Judge Yates appears to agree. "While each item of evidence taken individually may present a reasonable possibility that the verdict would have been different, taken as a whole, the evidence raises not only a possibility, but a probability that its disclosure would have produced a different result," he said.

*Eliot Spitzer's Last Admirer,* WALL STREET JOURNAL, Aug. 13, 2010, at A16.

**RESPONSE:** Defendants admit that, on August 13, 2010, the *Wall Street Journal* published an editorial entitled *Eliot Spitzer's Last Admirer.* Defendants aver that the editorial speaks for itself, respectfully refer the Court to the editorial for its contents, and for the convenience of the Court have appended a copy of the editorial hereto as Exhibit 1. Defendants deny the remaining allegations contained in paragraph 22 of the Complaint.

23. Thereafter, on August 22, 2010, on *Slate*.com, The Slate Group published an article written by Mr. Spitzer in which he responded to the August 13, 2010 *Wall Street Journal* editorial article.

**RESPONSE:**  Defendants admit that, on August 22, 2010, a piece authored by Mr. Spitzer was posted on the *Slate.com* website.  Defendants aver that this piece speaks for itself and respectfully refer the Court to the piece for its contents.  Defendants deny the remaining allegations contained in paragraph 23 of the Complaint.

24.    Mr. Spitzer's article is titled "They Still Don't Get It."  A print-out of the article by Mr. Spitzer is attached as Exhibit A.  The article is patently false and defamatory to Mr. Gilman in several respects.  Mr. Spitzer indicates that Mr. Gilman is guilty of crimes, even crimes he was never accused of, despite the fact that his conviction had been vacated and that Justice Yates indicated, with [*sic*] the vast amounts of exculpatory evidence "would have produced a different result."  While Mr. Spitzer's article does not name Mr. Gilman specifically, it is clear from the context that Mr. Spitzer is referring to Mr. Gilman.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 24 of the Complaint, except to admit that the piece authored by Mr. Spitzer is titled *They Still Don't Get It* and that a print-out is attached to the Complaint as Exhibit A.  Defendants aver that the piece speaks for itself and respectfully refer the Court to Exhibit A of the Complaint for its contents.

25.    The sentences from Mr. Spitzer's article prior to the defamatory quotes in paragraphs 27 to 32 below, highlight Mr. Gilman.  Mr. Spitzer's article states that "[t]he *[Wall Street Journal]* editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted.  The judge found that certain evidence that should have been turned over to the defense was not.  (The cases were tried after my tenure as attorney general.)"  Anyone that followed the cases in the newspaper, or was aware of the charges against Marsh and its employees at all could readily identify Mr. Gilman as one of the two employees at issue.  Indeed, any person with internet access can easily determine that

Mr. Gilman and Mr. McNenney were the two former Marsh employees who had their convictions vacated, and, thus, that Mr. Spitzer was referring to Mr. Gilman in his defamatory statements.

**RESPONSE:**  Defendants aver that the piece speaks for itself and respectfully refer the Court to Exhibit A of the Complaint for its contents.  Defendants deny the remaining allegations contained in paragraph 25 of the Complaint.

26.     Furthermore, public records still exist regarding the trials of Mr. Gilman and Mr. McNenney and the order vacating their convictions based on undisclosed exculpatory evidence.  While Mr. Spitzer did not use his name, it is obvious to the public that Mr. Spitzer was referring to Mr. Gilman in his defamatory statements.  That Mr. Spitzer was referring to Mr. Gilman was certainly obvious to, and harmed Mr. Gilman in, the insurance industry and any other part of the public observing the events related to Marsh.

**RESPONSE:**  Defendants admit that some public records regarding the trials of Mr. Gilman and Mr. McNenney still exist and that the piece did not name Mr. Gilman.  Defendants deny the remaining allegations contained in paragraph 26 of the Complaint.

27.     In the August 22, 2011 article, Mr. Spitzer defames Mr. Gilman by stating:

"Unfortunately for the credibility of the *[Wall Street] Journal,* the editorial fails to note the *many employees of Marsh* who have been convicted and *sentenced to jail terms."* (Emphasis added.)

**RESPONSE:**  Defendants aver that the piece speaks for itself and respectfully refer the Court to Exhibit A of the Complaint for its contents.  Defendants deny the remaining allegations contained in paragraph 27 of the Complaint.

28.     Contrary to Mr. Spitzer's statements, no Marsh employees were sentenced to jail terms, particularly not Mr. Gilman as all of the charges against him were dismissed or

vacated.  As such, Mr. Gilman has not faced any sentence at all.  At the time Mr. Spitzer made

these statements, he knew that Mr. Gilman, as well as his fellow Marsh employees who went to

trial, had been acquitted of the charges made against them.  Mr. Spitzer was also well aware of

the outcomes of the other cases against Marsh employees, all of which were resolved with

dismissals or sentences of an unconditional discharge.  No Marsh employee was sentenced to

incarceration.

      **RESPONSE:**  Defendants deny the allegations contained in paragraph 28 of the

Complaint.

      29.    Mr. Spitzer's defamation continues in the article.  Mr. Spitzer goes on to

state that:

> *"Marsh's behavior was a blatant abuse of law* and market power:
> *price-fixing, bid-rigging, and kickbacks* all designed to harm their
> customers and the market while Marsh and its employees pocketed
> the increased fees and kickbacks."  (Emphasis added.)

      **RESPONSE:**  Defendants aver that the piece speaks for itself and respectfully refer the

Court to Exhibit A of the Complaint for its contents.  Defendants deny the remaining allegations

contained in paragraph 29 of the Complaint.

      30.    However, Marsh's behavior with respect to contingent commissions and

otherwise, and Mr. Gilman's behavior in particular, was not illegal.  All of the criminal

allegations resulted in acquittals, dismissals, or unconditional discharges, including the

allegations against Mr. Gilman.  Also, in early 2010, the New York Attorney General even gave

Marsh permission to use contingent commissions again despite a settlement agreement with the

New York Attorney General where Marsh agreed not to do so.  There was nothing illegal about

any of the actions alleged by the New York Attorney General.

**RESPONSE:**  Defendants admit that, effective as of February 11, 2010, the settlement agreement between the Attorney General of the State of New York and the Superintendent of Insurance of the State of New York and the Marsh entities was amended to state that the Marsh entities shall comply with the terms of the original settlement agreement or shall provide compensation disclosure in accordance with the newly-adopted terms of 11 NYCCR 30 (Regulation No. 194, "Producer Compensation Transparency").  Defendants deny the remaining allegations contained in paragraph 30 of the Complaint.

      31.    The same statement by Mr. Spitzer was false and defamatory because, contrary to his assertions, no customers were harmed by Mr. Gilman's actions.  Mr. Spitzer, however, falsely stated:

> "Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks *all designed to harm their customers and the market* while Marsh and its employees pocketed the increased fees and kickbacks." (Emphasis added.)

**RESPONSE:**  Defendants aver that the piece speaks for itself and respectfully refer the Court to Exhibit A of the Complaint for its contents.  Defendants deny the remaining allegations contained in paragraph 31 of the Complaint.

      32.    Most egregiously, Mr. Spitzer's [*sic*] also falsely alleges that Mr. Gilman and his fellow employees "pocketed the increased fees and kickbacks" related to contingent commissions.  Mr. Spitzer falsely states:

> "Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while *Marsh and its employees pocketed the increased fees and kickbacks."* (Emphasis added.)

**RESPONSE:**  Defendants aver that the piece speaks for itself and respectfully refer the Court to Exhibit A of the Complaint for its contents.  Defendants deny the remaining allegations contained in paragraph 32 of the Complaint.

33.    In fact, no employee profited from the use of contingent commissions in any way, nor from any of the actions allegedly committed by Mr. Gilman.  As Mr. Spitzer is undoubtedly aware, neither he nor the subsequent attorneys general ever even alleged that Mr. Gilman or any other Marsh employee profited from the alleged scheme or, in any way, took kickbacks.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 33 of the Complaint.

34.    Mr. Spitzer's statement about employees pocketing fees and kickbacks is patently false and was never even an allegation made against a single Marsh employee.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 34 of the Complaint.

35.    While Mr. Spitzer's statements do not refer to Mr. Gilman by name and, instead, refer generically to "many employees of Marsh," Mr. Gilman is readily identifiable as the subject of the defamatory comments.

**RESPONSE:**  Defendants admit that the piece does not refer to Mr. Gilman by name and that the challenged statements only refer generically to the many employees of Marsh. Defendants deny the remaining allegations contained in paragraph 35 of the Complaint.

36.    Mr. Spitzer made these statements with actual malice towards Mr. Gilman. Mr. Spitzer was well aware of his own allegations as Attorney General and the resolution of those allegations in favor of Mr. Gilman and yet, recklessly disregarded these facts.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 36 of the Complaint.

37.     Further, any amount of fact checking would have revealed to The Slate Group that the statements of Mr. Spitzer in his August 22, 2011 article were false.  The Slate Group knew or should have known Mr. Spitzer's statements were false.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 37 of the Complaint.

38.     The statements against Mr. Gilman are defamatory per se in that they tended to injure Mr. Gilman in his trade, business, or profession and accused him of criminal activity.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 38 of the Complaint.

39.     Mr. Spitzer's defamatory statements were published in that they were communicated to the public via *Slate*.com with links to the article from *Slate*.com's main page. The article is also easily discoverable through Google searches regarding the events that Spitzer wrongly describes.

**RESPONSE:**  Defendants admit that the piece was posted on the *Slate.com* website with links to it from *Slate.com*'s home page.  Defendants deny the remaining allegations contained in paragraph 39 of the Complaint.

40.     As a consequence of Mr. Spitzer's false statements, Plaintiff has suffered general damages, including but not limited to, damage to his reputation.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 40 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (Defamation Per Se by Libel)

41.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-40, as if separately set forth herein.

**RESPONSE:**  In response to paragraph 41 of the Complaint, Defendants repeat and incorporate by reference their responses to paragraphs 1-40 of the Complaint.

42.    Defendants published, and caused to be published, false and damaging statements concerning Mr. Gilman.  Defendants' libel is permanent and can never be undone. Defendants published the libel on the internet through *Slate*.com.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 42 of the Complaint.

43.    Mr. Spitzer's statements, through *Slate*.com, are defamatory per se in that they accuse Mr. Gilman of criminal conduct and injure him in his trade, business, and profession. Mr. Spitzer is now a member of the media and is no longer protected by sovereign immunity.

**RESPONSE:**  Defendants admit that Mr. Spitzer is not protected by sovereign immunity with respect to actions undertaken when he was no longer a public official.  Defendants deny the remaining allegations contained in paragraph 43 of the Complaint.

44.    Before publishing the article by Mr. Spitzer, The Slate Group should have known that the assertions were false and misleading and The Slate Group was reckless as to the truth of the statements.  Thus both Mr. Spitzer and The Slate Group acted with actual malice in publishing Mr. Spitzer's article, to wit, this reckless disregard of the truth.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 44 of the Complaint.

45.     As a consequence of the publication of Mr. Spitzer's false statements, Mr. Gilman has suffered economic injury, and continues to suffer damages, including but not limited to, damage to his reputation.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 45 of the Complaint.

46.     By reason of the foregoing, both The Slate Group and Mr. Spitzer are liable to Mr. Gilman for actual, special, compensatory, general, and punitive damages.

**RESPONSE:**  Defendants deny the allegations contained in paragraph 46 of the Complaint.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     On the claim for defamation per se, damages, including actual, special, and compensatory damages of at least $10,000,000, general damages of at least $20,000,000, and punitive damages of at least $30,000,000 plus costs, interest, and attorneys' fees; and

B.     Such other and further relief as the Court deems appropriate under the circumstances.

**RESPONSE:**  Defendants deny that plaintiff is entitled to any of the relief requested in the unnumbered "WHEREFORE" paragraph of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

Plaintiff's claim is barred, in whole or in part, by the First and Fourteenth Amendments to the Constitution of the United States.

## THIRD DEFENSE

Plaintiff's claim is barred, in whole or in part, by the Constitution of the State of New York.

## FOURTH DEFENSE

The statements at issue are not capable of the defamatory meaning attributed to them by plaintiff.

## FIFTH DEFENSE

The allegedly defamatory statements are not "of and concerning" the plaintiff.

## SIXTH DEFENSE

The allegedly defamatory statements are fair and true reports of official proceedings, such that plaintiff's claim is bared by Section 74 of New York's Civil Rights Law.

## SEVENTH DEFENSE

The allegedly defamatory statements are true or substantially true, and plaintiff cannot carry his burden of proving that they are false.

## EIGHTH DEFENSE

Plaintiff's claim is barred, in whole or in part, by 47 U.S.C. § 230.

## NINTH DEFENSE

At all relevant times, plaintiff was a public figure.

TENTH DEFENSE

Defendants acted without malice, in both the Constitutional sense and the common law sense, and without the requisite scienter, in both the Constitutional sense and the common law sense, in all of their conduct relating to the statements at issue.

ELEVENTH DEFENSE

Defendants acted without fault as required by the United States Constitution in all of their conduct relating to the statements at issue.

TWELFTH DEFENSE

Plaintiff cannot recover damages because, at the time the allegedly defamatory statements were made, his reputation had already been irreparably damaged as a result of his own wrongful behavior.

THIRTEENTH DEFENSE

Any injury allegedly suffered by plaintiff was not proximately caused by Defendants.

FOURTEENTH DEFENSE

Plaintiff's alleged damages, if any, are the result of his own conduct or the conduct of others beyond the Defendants' control and for whom the Defendants are not legally responsible.

FIFTEENTH DEFENSE

Plaintiff has failed to mitigate his damages as required by law.

SIXTEENTH DEFENSE

The statements in question all related to matters of substantial public interest and concern.

SEVENTEENTH DEFENSE

By reason of the First and Fourteenth Amendments to the Constitution of the United

States, Defendants are immune from liability for punitive or exemplary damages under the

circumstances alleged in the Complaint.

EIGHTEENTH DEFENSE

Plaintiffs cannot recover punitive or exemplary damages under applicable law.

NINETEENTH DEFENSE

Plaintiffs are barred from recovery, in whole or in part, by the doctrine of incremental

harm.

TWENTIETH DEFENSE

Plaintiff's claim is barred, in whole or in part, by his failure to plead special damages.


The cause of action asserted in the Complaint is not set forth with sufficient particularity

to enable Defendants to determine all of their defenses.  Defendants therefore reserve the right to

assert any and all additional defenses as they may become known during the course of discovery

and hereby specifically reserve the right to amend the Answer to allege such defenses at such

time as they become known.

**WHEREFORE**, Defendants respectfully request that:

1.      Judgment be entered in their favor, and the Complaint be dismissed with prejudice;

2.      Defendants be awarded their costs, disbursements, and attorneys' fees; and

3.      The Court grant Defendants such other and further relief as is just and proper.

## COUNTERCLAIM

For their counterclaim against the Counterclaim Defendant, William Gilman, the Counterclaimants, Eliot Spitzer and The Slate Group LLC ("Slate"), state as follows:

### NATURE OF THE ACTION

1.      This is a civil action for damages and remedies, including costs and attorneys' fees, as provided by Section 70-a of New York's Civil Rights Law, against William Gilman. Because Gilman's claim against Eliot Spitzer and Slate is premised on reporting and commenting on Gilman's permitted activity, as a licensee of the New York State Department of Insurance, and the claim is without a substantial basis in law or fact, or supported by a substantial argument for the extension, modification, or reversal of existing law, Gilman is liable for damages, including attorneys' fees and costs, to Mr. Spitzer and Slate.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this claim under 28 U.S.C. §§ 1332 and 1367.  The amount in controversy exceeds $75,000.

3.      Venue is proper in this District under 28 U.S.C. § 1391.

### THE PARTIES

4.      Slate is a Delaware limited liability company, with offices in Washington, D.C. and New York.  Slate manages the website, *Slate.com*, an online publication that addresses matters of public interest and concern.

5.      Eliot Spitzer is a New York resident and the author of the piece at issue, which was published on *Slate.com*.  Mr. Spitzer previously served as the Attorney General of the State of New York.

6.      William Gilman is a resident of the State of New Jersey.

**THE FACTS**

7.       During the mid-1990s, Gilman was the head of Marsh Global Broking ("MGB") Excess Casualty.  Although his exact title was not always clear, he remained a senior executive at MGB through 2004.

8.       Gilman's insurance brokering activities at Marsh were conducted as a permitee of the State of New York.  Specifically, at all times relevant to this Counterclaim and Gilman's Complaint, he held license no. 715665 issued by the New York State Department of Insurance.

9.       As further explained below, Gilman played a central role in a conspiracy among MGB employees and excess casualty insurance carriers, from November 1998 through September 2004, to rig bids, fix prices among competitors, and allocate customers among competitors, in violation of New York state law.  Gilman was indicted and convicted of committing these criminal acts.  Although his conviction was later vacated, he has never been exonerated of his wrongdoing.

10.       Gilman, working in collusion with others at MGB (including Edward McNenney) and representatives of at least four major insurance companies, devised and implemented an illegal antitrust conspiracy fraudulently to obtain millions of dollars for MGB and its accomplice insurance companies by fixing prices and rigging the market for excess casualty insurance.

11.       Gilman's role at MGB included negotiating revenue-sharing agreements between MGB and excess casualty insurance carriers.  Gilman negotiated revenue-sharing agreements (so-called "placement services agreements" or "PSAs") with virtually all of the major insurance carriers that wrote excess casualty coverage.

12.       The PSAs negotiated by Gilman obligated the insurance carriers to pay MGB a unique form of "contingent commissions," which the Second Circuit has generally described as

"a euphemism for kickbacks – insurance brokers would receive payments from insurers for steering business their way." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 408 (2d Cir. 2008).  Although contingent commissions, *per se*, are neither illegal nor unethical, the form of contingent commissions utilized by MGB was both illegal and unethical, and its contours were not divulged to the insureds for whom MGB negotiated excess casualty coverage.

13.     The structure of the PSAs negotiated by Gilman very effectively aligned MGB's interest with the carrier's interest in charging higher premiums to MGB's customers.

14.     The kickbacks the carriers agreed to pay MGB were based upon the percentage of the aggregate gross premium volume the carriers placed with MGB clients.  The percentage increased as the aggregate premium volume increased.

15.     For example, under the agreement that Gilman negotiated with ACE Insurance for the year 2003, if MGB placed $100 million in aggregate premium volume with ACE, ACE was obligated to kickback 16% of the total to MGB; if the volume reached $140 million, ACE would kickback 18% of the total; and if the volume bound by MGB exceeded $180 million, ACE would kickback 20% of the total.

16.     As a result, the carriers who participated in the collaboration with MGB kicked back to MGB the following "contingent commissions":  in 2000, $40 million; in 2001, $60 million; in 2002, $110 million; and in 2003, $140 million.

17.     Gilman and his co-conspirators falsely represented to MGB's corporate customers (including IBM, Cisco Systems, Fortune Brands, Intel, Merle Norman Cosmetics, Signature Fruit Company, and Vivendi Universal) that they had solicited bids for excess insurance coverage in an open and competitive bidding process.  In fact, Gilman and his co-conspirators had, unbeknownst to MGB's corporate customers, identified which insurance company would win the

business, set a target for a pre-determined winner to submit as its bid, and obtained losing, higher bids from accomplice insurance companies.  The losing bids were referred to as "B quotes," "back-up quotes," "Bs," "fake quotes," "protective quotes," or "alternatives."

18.     In an email entitled "Rules of Engagement" in March 2001, Gilman and his co-conspirator, Edward McNenney, devised a formal system for non-competitive bidding and instructed MGB personnel to implement it.  Brief for Respondent in *People v. Gilman*, No. 472 (N.Y.A.D. 1st Dep't Feb. 11, 2009), at 18, attached hereto as Exhibit 2, *also available at* 2009 WL 7400106 (N.Y.A.D. 1st Dep't Feb. 11, 2009).

19.     Under this formal triage system, a pre-determined carrier (usually, but not always, the incumbent insurance company), would "win" the account at a specified premium level, and all other bids would be worse than the incumbent carrier's.  Under this system, all insurance companies participating in the bid-rigging scheme were aware of the status of the marketing effort.

20.     MGB sent explicit directions to the collaborating but non-winning carriers commanding them to provide the intentionally false, higher "B-quotes."  For example, one such communication read, "AIG has quoted [a certain price for a $25 million lead umbrella layer and another price for a $50 million lead umbrella layer].  Please over price your indications for [one or the other layer] or both if you can.  This is a fake quote[,] both of them are fake."  Ex. 2 at 20 n.10.

21.     If one of the carriers attempted actually to compete for a contract that MGB had not slotted it to win and/or refused to provide a "B quote" as requested, Gilman and his co-conspirators punished that carrier by arranging for other carriers to undercut its quotes on incumbent accounts it wished to renew.  In one instance, Gilman stated that, if an "alternative"

carrier (one not pre-selected to "win" the bid) intentionally submits a quote/bid below the "target" price fixed for the slotted winner, "we will put this guy in open competition on every [account] and CRUCIFY him.  Further, we *must* make sure incumbent keeps this (or another [carrier]) and *NOT* give it to the alternative and reward them."  Ex. 2 at 23.  The Third Circuit found this communication, *inter alia*, was sufficient evidence to establish a plausible "horizontal agreement among the insurers not to compete for renewal business," under the direction and coercive power of MGB.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 344 (3d Cir. 2010).

22.     In 2004, the New York State Insurance Department, which licenses and regulates all insurance brokers in the State, including Gilman (N.Y. State license no. 715665), launched an investigation, along with the New York State Attorney General's Office, into the fraudulent and anti-competitive activities of major insurance brokers, including MGB, and major insurance carriers in the excess casualty insurance market.  *See* New York Superintendent of Insurance Gregory V. Serio's Remarks (Oct. 14, 2004), attached hereto as Exhibit 3; Press Release: New York State Insurance Department Issues Citations to Marsh & McLennan Cos., Inc. and Marsh, Inc. as Part of Joint Investigation with New York State Attorney General's Office (Oct. 22, 2004) (noting that Marsh "and their New York-licensed subsidiary brokerage firms have been directed to appear at the Insurance Department on Nov. 23, 2004 to respond to charges that they used fraudulent, coercive, and dishonest practices and demonstrated untrustworthiness under New York State Insurance Law"), attached hereto as Exhibit 4.

23.     In January 2005, Marsh & McLennan Companies, Inc. ("Marsh") settled a civil complaint brought by the New York Attorney General and the New York State Department of Insurance, Complaint in *People v. Marsh & McLennan Cos.*, No. 403342/2004 (N.Y. Sup. Ct.

N.Y. Cnty. Oct. 14, 2004), attached hereto as Exhibit 5, in which Marsh agreed to pay $850

million in restitution to its customers, to issue a public apology, to implement reforms, and to

cooperate in the ongoing investigation against individuals.  *See* Settlement Agreement in *People*

*v. Marsh & McLennan Cos.*, No. 403342/2004 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 30, 2005),

attached hereto as Exhibit 6.  Marsh's public statement, issued as a condition of the settlement,

announced:

> Marsh, Inc. would like to take this opportunity to apologize for the
> conduct that led to the actions filed by the New York State Attorney
> General and Superintendent of Insurance.  The recent admissions by
> former employees of Marsh and other companies have made clear that
> **certain Marsh employees unlawfully deceived their customers**.  Such
> conduct was shameful . . .

*Id.* at 16 (emphasis added).

24.     Gilman was among the "certain Marsh employees [who] unlawfully deceived

their customers."

25.     Marsh later settled a class action brought by commercial purchasers of excess

insurance coverage brokered by Marsh, agreeing to pay approximately $69 million into the

settlement fund and to pay $14.5 million in fees to the attorneys for the plaintiffs' class.

26.     Two other insurance brokers and several insurance carriers also entered into

settlements with the State of New York.  In announcing its settlement with the Attorney General

and Superintendent of Insurance, insurance company American International Group ("AIG"),

then the world's largest-volume issuer of excess casualty coverage, declared that it would pay

$375 million "into a fund under the supervision of the [New York Attorney General] and the

[New York State Department of Insurance] to be available principally to pay certain AIG

insureds who purchased excess casualty policies through Marsh Inc."  Press Release, American

International Group, AIG Announces Settlements With Federal and New York Authorities and

General Insurance Reserve Charge (Feb. 9, 2006), attached hereto as Exhibit 7.  *See also* Jenner

& Block, Client Advisory: AIG Agrees to Far-Reaching Reforms to Resolve Allegations of

Accounting Improprieties, Bid Rigging, Contingent Commissions and Failure to Pay Workers'

Compensation Taxes (Feb. 16, 2006) ("AIG will pay $375 million to a fund administered by the

NYAG and the DOI to compensate AIG policyholders injured due to bid rigging . . ."), attached

hereto as Exhibit 8.

   27. Subsequently, twenty-one MGB and insurance carrier executives pleaded guilty to

violating the Donnelly Act (New York's General Business Law §§ 340, 341), or committing

Scheme to Defraud in the First Degree (New York Penal Law § 190.65), and agreed to cooperate

with the Attorney General's investigation.

   28. Karen Radke, an employee of AIG who pleaded guilty to participating in the

scheme to defraud insureds, identified Gilman in sworn testimony as an active participant in the

bid-rigging scheme.  During her plea allocution, Ms. Radke confirmed that:

> During this time period, Bill Gilman . . . and others at Marsh periodically
> instructed [her] and others at AIG to submit specific quotes for insurance
> rates that [she] believed were higher than those of the incumbent carriers,
> were designed to ensure that the incumbent carriers would win certain
> business, and resulted in clients being tricked and deceived by a deceptive
> bidding process[.]

Transcript of Allocution in *People v. Radke & Tateossian*, Nos. 5430/2004 & 5431/2004

(N.Y. Sup. Ct. N.Y. Cnty. Oct. 13, 2004) at 6:9-16, attached hereto as Exhibit 9.

   29. Ms. Radke also testified that Gilman told her about the Marsh system and that it

was very important that she not compete for other business in order to retain her business when

her accounts were up for renewal.  Ex. 2 at 24-26.

   30. In addition, two other excess casualty insurance company executives (Clive Tobin

and Michael Flaherty), who ultimately decided not to enter into the Marsh price-fixing

conspiracy (and who were *not* among the State's "cooperating witnesses" at Gilman's trial) both

testified that Gilman had explained to them the benefits of joining and participating in the

"Marsh system" of bid-rigging, price fixing and allocating customers among carriers.  As

Mr. Tobin testified:

> "We were on the roof, the atmosphere became slightly more informal
> and Mr. Gilman made a comment to the effect that maybe you're
> right, the pricing on some of this Band One business may need to go
> up and that maybe we can help you achieve some of those price
> increases and then Mr. Gilman went on to explain that the way we
> would achieve that would be that we would suggest the price
> increases that we needed. . . . And that Mr. Gilman would go to
> another carrier, and he mentioned two companies, AIG and Zurich,
> and that they would ask those – Marsh Global Broking would ask
> those companies to quote a price that was higher than the price that
> we needed so that the client understood our price to be a reasonable
> one in comparison to other markets, and that we needed to understand
> that if that was to happen there may be times when Marsh Global
> Broking would want to come to us and ask for a similar favor where
> we would quote prices higher than a competitor under the clear
> understanding we would not get the business."

Ex. 2 at 14 (quoting trial transcript); *see also id.* at 14-15 (quoting similar testimony by Michael

Flaherty regarding "B-quote" system of phony bids described by Gilman personally).

31.     On September 15, 2005, a New York State Grand Jury returned an indictment

charging Gilman, and others, with combination in restraint of trade and competition in violation

of the Donnelly Act, and Scheme to Defraud in the First Degree.  Indictment in *People v.*

*Gilman*, No. 4800/2009 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 15, 2005), attached hereto as Exhibit 10.

32.     The indictment charged that Gilman "during a period from about November 1998

to about September 2004, in the County of New York and elsewhere, acting with others known

and unknown to the Grand Jury, knowingly and intentionally entered into and engaged in a

contract, agreement, arrangement, and combination in an unreasonable restraint of trade and

competition, to wit, to restrain competition in the sale of excess casualty insurance by means of bid rigging, price fixing, and customer allocation." *Id.* (Count Two).

33.     Gilman was also charged with four counts of Grand Larceny in the First Degree, thirty counts of Grand Larceny in the Second Degree, and one count of Grand Larceny in the Third Degree.

34.     Gilman and his co-defendant Edward McNenney were tried in a bench trial from April 2007 through February 2008.  (Mr. Spitzer left the office of Attorney General in January 2007, before the trial started.)  The People elected to try the overarching Donnelly Act and Scheme to Defraud counts and 22 of the grand larceny counts, each of which detailed a specific transaction.

35.     On February 20, 2008, New York Supreme Court Justice James A. Yates entered a judgment of guilty against Gilman for violating the Donnelly Act, a felony offense.  Gilman was acquitted on some of the remaining charges and the others were dismissed.

36.     Justice Yates sentenced Gilman to sixteen weekends in jail and five years probation with 250 hours of community service.

37.     Gilman appealed the judgment of conviction and also moved to vacate the conviction pursuant to C.P.L. §§ 440.10(1)(f), (g), and (h).

38.     On July 2, 2010, Justice Yates granted Gilman's motion to vacate the judgment and order a new trial, on the ground that the Attorney General's Office, under Mr. Spitzer's successor, had not provided the defense with certain evidence the court believed should have been disclosed under *People v. Rosario*, 9 N.Y.2d 286 (1961), *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963).  Justice Yates' ruling did not exonerate

Gilman of any wrongdoing; it found only that Gilman was entitled to a new trial, based on the aforementioned legal ground.

39.     The People filed an appeal of Justice Yates' post-judgment order vacating Gilman's conviction.

40.     On January 11, 2011, Attorney General Eric Schneiderman moved to dismiss the indictment against Gilman on grounds that his office had "concluded that it would not be an efficient use of [this] office's resources or this Court's resources to pursue" a retrial of Gilman, in view of "the substantial amount of resources [it had] already expended on [the] case." Transcript of Proceedings in *People v. Gilman*, No. 4800/2009 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 11, 2011), attached hereto as Exhibit 11.  The People's appeal of Justice Yates' order of July 2, 2010 was withdrawn.  *See People v. Gilman*, 80 A.D.3d 542 (1st Dep't 2011).

41.     Emboldened by the dismissal of the indictment against them, Gilman and his co-conspirator Edward McNenney filed a series of baseless, vexatious and retaliatory lawsuits against those who had played a role in bringing to light their criminal wrongdoing.  The first such lawsuit was filed against Marsh and related entities and individuals.  *See* Second Amended Complaint, *Gilman v. Marsh & McLennan Cos.*, No. 10 Civ 8158 (JPO) (S.D.N.Y. filed Oct. 11, 2011) ("Marsh Action"), attached hereto as Exhibit 12.

42.     In their Second Amended Complaint in the Marsh Action, Gilman and McNenney falsely allege that Mr. Spitzer used the resources and imprimatur of his office, as New York's Attorney General, to investigate and prosecute them in collusion with Marsh, and "[p]ursuant to the collusion, Marsh offered up Messrs. Gilman and McNenney as targets for criminal prosecution in return for a lenient settlement between Marsh and the New York Attorney General."  Sec. Am. Compl., Marsh Action, ¶ 39.  According to the allegations set forth in the

Second Amended Complaint, Mr. Spitzer's alleged motivation for so blatantly misusing his public office was his plan to run for Governor of New York: "[t]o further bolster his crime fighting credentials (even though the evidence did not justify such prosecutions)."  *Id.* ¶ 42.

43.     In their Second Amended Complaint in the Marsh Action, Gilman and McNenney further falsely allege that Mr. Spitzer masterminded and orchestrated Marsh's removal of its then-CEO Jeffrey Greenberg and its decision to replace him with Michael Cherkasky, who is also named as a defendant in the case.  *Id.* ¶ 44.  According to the Second Amended Complaint, the reason for Mr. Spitzer's maneuver was that Cherkasky and Spitzer were "close friends," Cherkasky had been Mr. Spitzer's boss at the Manhattan District Attorney's Office, and he "had contributed to Spitzer's campaigns."  *Id.* ¶ 47.  The Second Amended Complaint also includes Gilman's and McNenney's assertion, made "[u]pon information and belief," that in a secret meeting between Mr. Spitzer and representatives of Marsh in mid-October 2004, Mr. Spitzer demanded the removal of Greenberg and the installation of Cherkasky as CEO as a condition for any possible settlement of the Attorney General's civil complaint against Marsh, and "[a]s expected, Marsh followed Mr. Spitzer's directive."  *Id.* ¶¶ 46, 48, 49.  All of these allegations relating to Mr. Spitzer in the Second Amended Complaint in the Marsh Action are false.

44.     Apparently as a result of Mr. Spitzer's immunity for acts undertaken in his capacity as Attorney General, he is not named as a defendant in the Marsh Action.  Instead, as explained further in the paragraphs that follow, he has been named as a defendant in this equally vexatious and baseless action.

45.     On August 13, 2010, *The Wall Street Journal* published an editorial in which it criticized then-New York Attorney General Andrew Cuomo for continuing to pursue claims against former AIG CEO Hank Greenberg.  Ex. 1.  The editorial noted that, a month earlier,

Justice Yates had "vacated the felony convictions of two former employees of Marsh & McLennan Companies because the Attorney General's Office had failed to turn over potentially exculpatory evidence to the defense." The *Wall Street Journal* editorial urged Cuomo to drop the charges against Greenberg in recognition of "the dubious nature of the Spitzer charges."

46.     In response to the public debate concerning the allegedly "dubious nature" of the criminal charges that had been filed against Greenberg and others, Mr. Spitzer authored a piece, published under the headline, "They Still Don't Get It:  Some people on Wall Street, and at the Wall Street Journal, speak as if the financial crisis never happened," on *Slate.com* on August 22, 2010.  Compl. Ex. A.  In that piece, Mr. Spitzer summarized the nature of his office's investigation and ultimate legal proceedings related to AIG and Marsh and, *inter alia*, expressed his views on the public controversy surrounding the conduct of those licensed to engage in insurance brokerage by the New York Department of Insurance.  *See id.*

47.     With specific reference to Marsh, Mr. Spitzer's piece noted that licensees of the New York Department of Insurance within Marsh had engaged in "a blatant abuse of law and market power:  price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks.  Marsh as a company paid an $850 million fine to resolve the claims and brought in new leadership."  *Id.*

48.     The piece did not identify Gilman or any other Marsh employee other than former CEO Jeffrey Greenberg.  It did, however, expressly confirm that the criminal cases brought against two otherwise unidentified Marsh employees had been dismissed after the defendants had been convicted.  At the time, Marsh had approximately 50,000 employees.  Marsh & McLennan Cos., Quarterly Report (Form 10-Q), at 35 (Nov. 9, 2010), *available at* http://www.sec.gov/Archives/edgar/data/62709/000119312510254061/d10q.htm.

49.     On August 19, 2011, weeks after he filed his Second Amended Complaint in the Marsh Action containing the allegations about Mr. Spitzer, Gilman filed the Complaint in this action, No. 11 Civ 5843 (S.D.N.Y.), asserting a baseless, legally and factually insupportable claim for "defamation *per se* by libel" against Mr. Spitzer and Slate, ostensibly premised on the August 22, 2010 piece posted on *Slate.com*.  Neither Mr. Gilman nor any of his representatives ever complained to Mr. Spitzer or Slate about the piece in the year prior to filing suit—there was no retraction demand, no request for a correction or clarification, nor even a letter to the editor. In his Complaint, Gilman alleges that the statements made in the piece about Marsh employees generally are defamatory of him.  This action has since been designated by the Court as "related" to the Marsh Action.

## FIRST COUNTERCLAIM FOR RELIEF
(New York Anti-SLAPP Statute, Civil Rights Law § 70-a)

50.     Counterclaimants repeat and reallege the allegations contained in ¶¶ 1 through 49 above, as if separately set forth herein.

51.     As the holder of license no. 715665 issued by the New York State Department of Insurance, Gilman is a "public applicant or permitee," within the meaning of New York's Civil Rights Law, § 76-a(1)(b).

52.     The August 22, 2010 piece, authored by Mr. Spitzer and posted on *Slate.com*, reports and comments on insurance brokering activities conducted by Marsh and its employees pursuant to the license and permission of the New York State Department of Insurance.

53.     The claim filed by Mr. Gilman on or about August 19, 2011, in No. 11 Civ 5843 (S.D.N.Y.), is an "action involving public petition and participation," because it "is materially related to any efforts of [Spitzer and Slate] to report on, comment on, . . . challenge or oppose such . . . permission."

54.     Gilman's claim of "defamation *per se* by libel" against Mr. Spitzer and Slate was commenced, and is being continued, without a substantial basis in fact and law, for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech by Mr. Spitzer and Slate, and cannot be supported by a substantial argument for the extension, modification, or reversal of existing law.

55.     By reason of the foregoing, Gilman is liable to Mr. Spitzer and Slate for their damages on this counterclaim, including their costs and attorneys' fees, as provided by § 70-a(1) of New York's Civil Rights Law.

WHEREFORE, Counterclaimants Eliot Spitzer and The Slate Group, LLC demand judgment against Counterclaim Defendant Gilman as follows:

a.     On their claim for an action involving public petition and participation, under New York's Civil Rights Law § 70-a, for recovery of damages, including their costs and attorneys' fees; and

b.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Counterclaimants demand a trial by jury on all issues so triable.


Dated:  November 1, 2011                          Respectfully submitted,

                                                  LEVINE SULLIVAN KOCH & SCHULZ, LLP

                                                  By:___s/Jay Ward Brown_____
OF COUNSEL:                                           Lee Levine, *pro hac vice*
                                                      Jay Ward Brown, Bar No. JB-4376
Eric Lieberman                                        Katharine Larsen, Bar No. KL-6153
James A. McLaughlin                               1050 Seventeenth Street, NW, Suite 800
THE WASHINGTON POST COMPANY                       Washington, DC  20036
1150 Fifteenth Street, NW                         Telephone:  (202) 508-1100
Washington, DC 20071-7301                         Facsimile:  (202) 861-9888
Telephone:  (202) 334-6000                        llevine@lskslaw.com
Facsimile:  (202) 334-5075                        jbrown@lskslaw.com
mclaughlinj@washpost.com                          klarsen@lskslaw.com
liebermane@washpost.com

                                                  *Counsel for Defendants/Counterclaimants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Answer, Affirmative Defenses, and

Counterclaim of Defendants/Counterclaimants Eliot Spitzer and The Slate Group, LLC was

served via the Court's CM/ECF system this 1st day of November 2011 upon the following:

> Jeffrey L. Liddle
> James W. Halter
> LIDDLE & ROBINSON, L.L.P.
> 800 Third Avenue
> New York, NY 10022
> *Counsel for Plaintiff/Counterclaim Defendant*

      s/Jay Ward Brown      

Jay Ward Brown
