**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**


**WILLIAM GILMAN,**

        **Plaintiff/Counterclaim Defendant,**        No. 11 Civ 5843 (JPO)
        **ECF Case**

**v.**

        **ORAL ARGUMENT**
**ELIOT SPITZER and THE SLATE GROUP, LLC,**        **REQUESTED**

        **Defendants/Counterclaimants.**


**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**


OF COUNSEL:

Eric Lieberman
James A. McLaughlin
THE WASHINGTON POST COMPANY
1150 Fifteenth Street, NW
Washington, DC 20071-7301
Telephone:  (202) 334-6000
Facsimile:  (202) 334-5075
mclaughlinj@washpost.com
liebermane@washpost.com

Lee Levine, *pro hac vice*
Jay Ward Brown, Bar No. JB-4376
Katharine Larsen, Bar No. KL-6153
LEVINE SULLIVAN KOCH & SCHULZ LLP
1050 Seventeenth Street, NW, Suite 800
Washington, DC  20036
Telephone:  (202) 508-1100
Facsimile:  (202) 861-9888
llevine@lskslaw.com
jbrown@lskslaw.com
klarsen@lskslaw.com

*Counsel for Defendants/Counterclaimants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND....................................................................................................2

    I.     BACKGROUND ................................................................................ 2

    II.    THE PUBLICATION AT ISSUE ................................................................7

    III.   EVENTS FOLLOWING PUBLICATION............................................................8

    IV.   THE PRESENT LAWSUIT .....................................................................9

ARGUMENT .....................................................................................................................10

    I.     APPLICABLE LAW STRONGLY FAVORS EARLY
          DISMISSAL OF DEFECTIVE DEFAMATION CLAIMS .................................11

    II.    THE FIRST CHALLENGED STATEMENT IS NOT
          ACTIONABLE AS A MATTER OF LAW BECAUSE IT
          CANNOT REASONABLY BE UNDERSTOOD TO BE OF AND
          CONCERNING PLAINTIFF ................................................................12

    III.   THE SECOND CHALLENGED STATEMENT IS NOT
          ACTIONABLE AS A MATTER OF LAW .........................................................15

        A.    The Second Challenged Statement, Which Is About Marsh,
              Cannot Reasonably Be Understood To Be Of And
              Concerning Plaintiff As A Matter Of Law ................................15

        B.    The Second Challenged Statement Is In Any Event
              Privileged As A Fair And True Report Of An Official
              Proceeding.............................................................................19

CONCLUSION...................................................................................................................24

# TABLE OF AUTHORITIES

*Abramson v. Pataki,*
   278 F.3d 93 (2d Cir. 2002)............................................................................................16

*AIDS Counseling & Testing Centers v. Group W Television, Inc.,*
   903 F.2d 1000 (4th Cir. 1990) .....................................................................................17

*Algarin v. Wallkill,*
   421 F.3d 137 (2d Cir. 2005).........................................................................................16

*Becher v. Troy Publishing Co.,*
   183 A.D.2d 230 (3d Dep't 1992) .................................................................................19

*Bordoni v. New York Times Co.,*
   400 F. Supp. 1223 (S.D.N.Y. 1975).............................................................................13

*Brady v. Ottaway Newspapers, Inc.,*
   445 N.Y.S.2d 786 (2d Dep't 1981)...............................................................................12

*Byrd v. City of New York,*
   2005 WL 1349876 (2d Cir. June 8, 2005) ...................................................................10

*CACI Premier Technology, Inc. v. Rhodes,*
   536 F.3d 280 (4th Cir. 2008) .......................................................................................17

*Cardillo v. Doubleday & Co.,*
   366 F. Supp. 92 (S.D.N.Y. 1973),
   *aff'd,* 518 F.2d 638 (2d Cir. 1975).............................................................................11

*Cardone v. Empire Blue Cross & Blue Shield,*
   884 F. Supp. 838 (S.D.N.Y. 1995) .........................................................................17-18

*Carlucci v. Poughkeepsie Newspapers, Inc.,*
   57 N.Y.2d 883 (1982) ..................................................................................................12

*Chaiken v. VV Publishing Corp.,*
   907 F. Supp. 689 (S.D.N.Y. 1995) ..............................................................................11

*Church of Scientology International v. Behar,*
   238 F.3d 168 (2d Cir. 2001).........................................................................................12

*Church of Scientology International v. Time Warner, Inc.,*
   806 F. Supp. 1157 (S.D.N.Y. 1992),
   *aff'd sub nom Church of Scientology International v. Behar,*
   238 F.3d 168 (2d Cir. 2001).........................................................................................14

*Church of Scientology International v. Time Warner, Inc.*,
  903 F. Supp. 637 (S.D.N.Y. 1995),
  *aff'd sub nom Church of Scientology International v. Behar*,
  238 F.3d 168 (2d Cir. 2001)..................................................................11

*Coles v. Washington Free Weekly*,
  881 F. Supp. 26 (D.D.C. 1995)............................................................12

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004)....................................................13

*Diaz v. NBC Universal, Inc.*,
  337 F. App'x 94 (2d Cir. 2009) ...........................................................17

*Easton v. Public Citizens, Inc.*,
  1991 WL 280688 (S.D.N.Y. Dec. 26, 1991),
  *aff'd*, 969 F.2d 1043 (2d Cir. 1992).....................................................19

*Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*,
  288 F. Supp. 2d 273 (E.D.N.Y. 2003),
  *aff'd*, 109 Fed. App'x 442 (2d Cir. 2004) ............................................16

*Fulani v. New York Times Co.*,
  260 A.D.2d 215 (1st Dep't 1999) .........................................................16

*G&R Moojestic Treats, Inc. v. Maggiemoo's International, LLC*,
  2004 WL 1172762 (S.D.N.Y. May 27, 2004) ........................................18

*Geiger v. Town of Greece*,
  311 F. App'x 413 (2d Cir. 2009) ......................................................19-20

*Glendora v. Gannett Suburban Newspapers*,
  201 A.D.2d 620 (2d Dep't 1994)..........................................................20

*Gonzalez v. Gray*,
  69 F. Supp. 2d 561 (S.D.N.Y. 1999),
  *aff'd*, 216 F.3d 1072 (2d Cir. 2000) ....................................................20

*Gotbetter v. Dow Jones & Co.*,
  259 A.D.2d 335 (1st Dep't 1999) .........................................................20

*Greenbelt Cooperative Publishing Association v. Bresler*,
  398 U.S. 6 (1970) ...............................................................................18

*Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*,
  2009 WL 4547792 (E.D.N.Y. Dec. 1, 2009) .........................................23

iii

*Holy Spirit Association for Unification of World Christianity v. New York Times Co.*,
  49 N.Y.2d 63 (1979) .................................................................................................19, 20

*Idema v. Wager*,
  120 F. Supp. 2d 361 (S.D.N.Y. 2000),
  *aff'd*, 29 F. App'x 676 (2d Cir. 2002) ....................................................................12

*In re State Street Bank & Trust Co.*,
  772 F. Supp. 2d 519 (S.D.N.Y. 2011) .....................................................................13

*James v. Gannett Co.*,
  40 N.Y.2d 415 (1976) ...............................................................................................13

*Karedes v. Ackerley Group, Inc.*,
  423 F.3d 107 (2d Cir. 2005).....................................................................................12

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006).............................................................................12, 16

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991).....................................................................................11

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997).....................................................................................12

*Lines v. Cablevision Systems Corp.*,
  2005 WL 2305010 (E.D.N.Y. Sept. 21, 2005) .......................................................17

*Machleder v. Diaz*,
  538 F. Supp. 1364 (S.D.N.Y. 1982).........................................................................11

*McBride v. Crowell-Collier Publishing Co.*,
  196 F.2d 187 (5th Cir. 1952) ...................................................................................17

*Mulder v. Donaldson, Lufkin & Jenrette*,
  161 Misc. 2d 698 (N.Y. Sup. Ct. N.Y. Cnty. 1994),
  *aff'd*, 208 A.D.2d 301 (1st Dep't 1995)...............................................................22-23

*National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Labs*,
  850 F.2d 904 (2d Cir. 1988)......................................................................................10

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..................................................................................................12

*Norman v. Borison*,
  994 A.2d 1019 (Md. Ct. Spec. App. 2010) ..............................................................17

*Pelayo v. Celle,*
   270 A.D.2d 469 (2d Dep't 2000) ..................................................................19

*People v. Gilman,*
   80 A.D.3d 542 (1st Dep't 2011) .........................................................5, 6, 9, 21

*People v. Gilman,*
   2010 WL 3036983 (N.Y. Sup. Ct. N.Y. Cnty. July 2, 2010)...............................5, 6

*Piazza v. Florida Union Free School District,*
   777 F. Supp. 2d 669 (S.D.N.Y. 2011)............................................................11

*Pisani v. Staten Island University Hospital,*
   440 F. Supp. 2d 168 (E.D.N.Y. 2006) ............................................................17

*Provisional Government of Republic of New Afrika v. American Broadcasting Cos.,*
   609 F. Supp. 104 (D.D.C. 1985) .......................................................... 15-16, 17

*RE/MAX International, Inc. v. Smythe, Cramer Co.,*
   265 F. Supp. 2d 882 (N.D. Ohio 2003)............................................................17

*Rolon v. Henneman,*
   443 F. Supp. 2d 532 (S.D.N.Y. 2006) .............................................................10

*Rothman v. Gregor,*
   220 F.3d 81 (2d Cir. 2000)............................................................................11

*Staehr v. Hartford Financial Services Group, Inc.,*
   547 F.3d 406 (2d Cir. 2008)................................................................. 10-11, 18

*Willis v. United Family Life Insurance,*
   487 S.E.2d 376 (Ga. Ct. App. 1997) ...............................................................17

STATUTES

N.Y. Civil Rights Law, Section 74 ................................................................. *passim*

# INTRODUCTION

Plaintiff William Gilman, a former employee of Marsh & McLennan Companies, Inc. ("Marsh"), who was indicted along with numerous other employees of Marsh and other insurance-related companies in connection with a bid-rigging scheme, claims that he was defamed by a piece written in August 2010 by former New York Attorney General Eliot Spitzer in which Mr. Spitzer defended the State's decision to initiate civil and criminal proceedings. The piece, posted by The Slate Group, LLC on the website www.slate.com ("*Slate.com*"), was written in response to a *Wall Street Journal* editorial that criticized the cases Mr. Spitzer had initiated—and which then-Attorney General Andrew Cuomo had elected to continue—against another insurance company, AIG. Mr. Gilman is not mentioned by name in the piece, and the only indirect reference to him is a concededly accurate account of the status of the criminal proceeding pending against him at the time of publication—that the convictions of two unnamed former Marsh employees had been vacated based on prosecutorial error at trial.

In January 2011, some five months after the piece was published, the State decided to dismiss its case against Mr. Gilman. Thereafter, he commenced litigation in this Court against Marsh for malicious prosecution, alleging that it and its CEO had engaged in a breathtaking conspiracy with Mr. Spitzer to make Mr. Gilman the scapegoat for Marsh's misconduct. Motions to dismiss that suit, in which Mr. Spitzer is not named as a defendant, are now pending. At the same time, Mr. Gilman initiated this litigation against Mr. Spitzer and *Slate.com* for defamation based on Mr. Spitzer's year-old piece about the judicial proceedings. As Defendants demonstrate *infra*, Mr. Gilman's defamation claims fail for multiple reasons, including those that form the basis of this motion: that (1) the defamatory meanings he attributes to the piece cannot

reasonably be understood as "of and concerning" him as a matter of law, and (2) the piece is

privileged, also as a matter of law, pursuant to N.Y. Civil Rights Law, Section 74.[1]

## **FACTUAL BACKGROUND**[2]

### I. BACKGROUND

Mr. Gilman, who worked in the insurance industry for 35 years, ultimately became a

senior executive at Marsh.  As he himself alleges, he was personally responsible for a significant

percentage of Marsh's annual profits.  Compl. ¶¶ 4, 7-8.  Indeed, Mr. Gilman participated in a

revenue-generating system that included, among other features, the extracting of substantial

"contingent commissions" from insurance companies in return for placement of business with

them, as well as the rigging of bids from insurance carriers so that a Marsh client's incumbent

carrier would not actually face price competition at renewal.  *See, e.g.,* Compl. ¶ 10; *see also*

Answ. Ex. 10 (Indictment).

In approximately May 2004, then-Attorney General Spitzer began a broad investigation

of the insurance industry, including of fraud and anti-competitive practices at various companies,

among them AIG and Marsh.  *See, e.g.,* Compl. ¶ 9 & Ex. A.  In response to the State's

investigation, Marsh conducted its own internal investigation, as part of which it interviewed

Mr. Gilman in June 2004.  *See* Answ. Ex. 12 (Second Amended Complaint in *Gilman v.*

---

[1]      Defendants reserve their other defenses, including that Mr. Gilman cannot meet his burden of proving that the challenged statements are materially false or that he suffered any actual injury as a result of the publication at issue, or that Mr. Spitzer or *Slate.com* breached the applicable standard of care.  In addition, *Slate.com* is immune from suit in these circumstances pursuant to 47 U.S.C. § 230.  Because these defenses at least arguably are not ripe for adjudication at this stage of the litigation (and need not be reached at all, in light of the irreparable defects in the Complaint discussed *infra*), Defendants have not raised them now.

[2]      On this motion for judgment on the pleadings, the Court is required to accept as true all well-pleaded factual allegations by the non-movant.  *See infra* at 10-11.  While Defendants therefore cite to the Complaint in recounting background facts, this should not be construed as an admission by them that Plaintiff's allegations are accurate.  Additionally, Defendants cite to certain materials outside the pleadings, such as documents referred to in the Complaint, and to the record in other judicial proceedings.  The Court is entitled in adjudicating this motion to take judicial notice of such matters without converting the motion to one for summary judgment.  *See id.*  These materials are attached as exhibits to Defendants' Answer and Counterclaim and are cited herein as "Answ. Ex. _".

*Marsh*) ¶ 34.  On October 13, 2004, Karen Radke, an employee of AIG, pleaded guilty to having engaged in a criminal scheme to defraud AIG's insurance clients.  In her plea allocution, she stated under oath that Mr. Gilman was a co-conspirator in the criminal scheme.  Answ. Ex. 9 (transcript of Oct. 13, 2004 allocution) at 6:3-7:6.

The next day, October 14, 2004, the State filed a civil lawsuit against Marsh. Compl. ¶ 12.  The complaint describes in specific detail multiple species of wrongdoing at Marsh.  Answ. Ex. 5 (Complaint in *People v. Marsh*) ¶¶ 18-74.  The centerpiece of the State's suit against Marsh was a system of bid-rigging in which, as a condition of doing business, Marsh required insurance carriers to submit phony quotations for insurance coverage (often referred to as "B Quotes") in order to protect incumbent carriers from competition, thereby causing Marsh's clients to incur higher premiums than would otherwise be available to them.  *Id.* at ¶¶ 9, 11, 23, 43-74.  As the State specifically alleged, this bid-rigging scheme

> was strictly enforced by Marsh through William Gilman, Executive Director of Marketing at Marsh Global Broking and a Managing Director.  Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes.  Gilman likewise advised AIG of the benefits of the system.  As he put it: Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

*Id.* ¶ 50.  Based on this pattern of misconduct, the State asserted claims against Marsh for, among other things, fraud and violation of antitrust laws, and sought injunctive relief and damages, including punitive damages.  *Id.* ¶¶ 79-87.

Marsh thereafter suspended Mr. Gilman.  Answ. Ex. 12 ¶ 56.  On November 1, 2004, he informed Marsh that he was retiring, and filed the necessary paperwork to do so.  *Id.* ¶ 58.  The

3

next day, however, Marsh informed Mr. Gilman that he would be terminated rather than be permitted to retire.  *Id.* ¶ 59.

As Mr. Gilman correctly alleges, *see* Compl. ¶ 14, Marsh promptly settled the State's civil claims against it in January 2005, paying $850 million in restitution to customers and agreeing to change its practices in significant respects.  Among other things, Marsh expressly agreed that it would not "directly or indirectly knowingly accept from or request of any insurer any false, fictitious, inflated, artificial, 'B' or 'throw away' quote or indication."  Answ. Ex. 6 (Jan. 30, 2005 Settlement Agreement) ¶ 12.  As part of the settlement, Marsh issued a public statement in which it "apologize[d] for the conduct that led to the actions filed [by the Attorney General and the Insurance Superintendent]," and acknowledged that "recent admissions by former employees of Marsh and other companies have made clear that certain Marsh employees unlawfully deceived their customers."  *Id.* at 16.

Nine months later, in September 2005, the State announced the indictment of Mr. Gilman and others.  Compl. ¶ 15.  The Indictment describes the bid-rigging scheme:

> Defendants, and other participants in the scheme, engaged in fraudulent conduct as follows:  Marsh employees, including defendants, falsely represented to customers that M[arsh] G[lobal] B[roking] had solicited bids from insurance companies in an open and competitive bidding process.  In fact, defendants rigged the process:  first, by determining which Accomplice Company would win the business; second, by setting a "target" for the predetermined winner to submit as its bid; and third, by obtaining "losing bids" from employees at other Accomplice Companies.  Defendants and their accomplices referred to such losing bids as "B bids," "fake quotes," "bogus quotes," . . . "alternative leads," "alternatives," "honey," "protective quotes," or "protection."  As defendants intended, the customer selected the insurance company with the most attractive bid, unaware that the selection had been fraudulently pre-ordained . . . .

4

Answ. Ex. 10 (Indictment) at Count One.  Count Two of the Indictment, for criminal antitrust violations under the Donnelly Act, expressly was based on this scheme of "bid rigging, price fixing and customer allocation."  *Id.* at Count Two.[3]

After an 11-month bench trial, in February 2008, Mr. Gilman was convicted on the Donnelly Act charge, based on the bid-rigging or "B" quote system.  Compl. ¶ 16; *see also* Answ. Ex. 12 ¶¶ 77, 87.[4]  Mr. Gilman was sentenced to 16 weekends in prison, 250 hours of community service and five years of probation, Compl. ¶ 20 n.2; *People v. Gilman*, 80 A.D.3d 542, 542 (1st Dep't 2011), but this sentence was suspended while he appealed his conviction, *People v. Gilman*, No. 4800/2009, 2010 WL 3036983, at *2 (N.Y. Sup. Ct. N.Y. Cnty. July 2, 2010) (Table).  On appeal, then-Attorney General Andrew Cuomo vigorously defended the bid-rigging conviction the State had obtained against Mr. Gilman, citing in the Appellate Division multiple examples of the specific evidence of his personal participation in the criminal scheme. *See* Answ. Ex. 2 (state's appeal brief) at 13-24.[5]

---

[3]    Throughout his Complaint, Mr. Gilman engages in a sleight of hand by employing the phrase "contingent commissions" and emphasizing they are not illegal.  But the criminal charges against Mr. Gilman were not based on his extraction of contingent commissions; they were based on price-fixing and bid-rigging, crimes that were *motivated* by the prospect of increased contingent commissions.  *See, e.g.,* Answ. Ex. 2 (state's appeal brief) at 10-13 & 15 n.6 (pointing out that Gilman was not indicted for his involvement with contingent commissions, but asserting that they provided the motive for his other criminal conduct, including bid-rigging).

[4]    Mr. Gilman was originally charged with one count based on the Donnelly Act, one count of criminal fraud, and 35 counts of grand larceny.  Each larceny charge was based on a specific insurance brokerage transaction on behalf of a Marsh client  The state elected to bring to trial 22 of the larceny charges and the overarching fraud and antitrust counts.  At trial, Mr. Gilman was convicted on the Donnelly Act charge; some of the remaining charges were dismissed and he was acquitted on the others.  *See generally People v. Gilman*, No. 4800/2009, 2010 WL 3036983, at *2-*3. (N.Y. Sup. N.Y. Cnty. July 2, 2010) (describing charges tried against Gilman).

[5]    For example, the State quoted the testimony of one non-cooperating witness, an insurance company executive, regarding an encounter with Mr. Gilman after the executive had suggested to Mr. Gilman that Marsh's proposal to charge even higher contingent commissions would cost the insurance company too much money:

> "We were on the roof, the atmosphere became slightly more informal and Mr. Gilman made a comment to the effect that maybe you're right, the pricing on some of this Band One business may need to go up and that maybe we can help you achieve some of those price increases and then Mr. Gilman went on to explain that the way we would achieve that would be that we would suggest the price increases that we needed. . . . And that Mr. Gilman would go to another carrier, and he

While Mr. Gilman's appeal remained pending, during the subsequent bench trial of other defendants implicated in Marsh's misconduct, it became apparent that trial prosecutors had failed to produce certain documents to them and to Mr. Gilman in violation of the State's *Brady* and related obligations.  Compl. ¶¶ 17-18; *see also People v. Gilman*, 2010 WL 3036983, at *3-*4. For this reason, the trial judge vacated Mr. Gilman's conviction on July 2, 2010, finding that the newly disclosed evidence, which largely related to possible impeachment of certain cooperating witnesses, warranted a new trial.  *People v. Gilman*, 2010 WL 3036983, at *3, *20; *see also* Compl. ¶ 18; Answ. Ex. 12 ¶ 77.  The State appealed from the order vacating the conviction, *People v. Gilman*, 80 A.D.3d at 542, while Mr. Gilman's own appeal from his conviction remained pending.

A month later, on August 13, 2010, the *Wall Street Journal* published an editorial under the headline, "Eliot Spitzer's Last Admirer."  *See* Compl. ¶ 22 (excerpts); Answ. Ex. 1 (complete copy).  In the context of chiding then-Attorney General Cuomo for continuing AIG-related prosecutions initiated by Mr. Spitzer's office, the editorial criticized Mr. Spitzer and noted that the trial court had just "vacated the felony convictions of two former employees of Marsh & McLennan Companies because the Attorney General's office had failed to turn over potentially exculpatory evidence to the defense."  Compl. ¶ 22 (quoting editorial).

---

> mentioned two companies, AIG and Zurich, and that they would ask those – Marsh Global Broking would ask those companies to quote a price that was higher than the price that we needed so that the client understood our price to be a reasonable one in comparison to other markets, and that we needed to understand that if that was to happen there may be times when Marsh Global Broking would want to come to us and ask for a similar favor where we would quote prices higher than a competitor under the clear understanding we would not get the business."

Answ. Ex. 2 at 14 (quoting trial transcript); *see also id.* at 14-15 (quoting similar testimony by second non-cooperating witness regarding "B-quote" system of phony bids described by Gilman personally); *id.* at 19-23 (describing email messages from Gilman instructing others to carry out scheme, including instructions to obtain specific rigged bids on particular client accounts).

## II.   THE PUBLICATION AT ISSUE

Nine days later, in response to the *Wall Street Journal* editorial, Mr. Spitzer authored a piece that he contributed to *Slate.com*, and which was posted on August 22, 2010.  A copy of Mr. Spitzer's piece is attached to the Complaint as Exhibit A.  The piece appears under the headline, "They Still Don't Get It – Some people on Wall Street, and at the Wall Street Journal, speak as if the financial crisis never happened."  Mr. Spitzer's piece opens with a direct reference to "the *Wall Street Journal*'s obsession with attacking and misrepresenting the multiple cases that I brought against both AIG and its former chairman and CEO, Hank Greenberg."  Compl. Ex. A at 1.  Next, Mr. Spitzer explains his view that the attacks on his prosecutions are part of a larger pattern of denial in the financial industry that serves to obstruct effective government policymaking in the wake of the financial crises.  *Id.*  In so stating, Mr. Spitzer observes that, "in view of the *Journal*'s recent editorial, a few facts are in order," and proceeds to review his office's prosecution of AIG and certain of its employees, which resulted in a $1.6 billion settlement, among other concessions by AIG, as well as the convictions of five people.  *Id.* at 1-2.  Mr. Spitzer notes that "[c]ontrary to the claims of the *Journal*'s editorial, the cases against Greenberg and AIG have been both proper and successful" as well as "necessary to the vindication of justice and ethics in the marketplace."  *Id.* at 2.

It is in this context that Mr. Spitzer addresses his office's investigation of Marsh, the text of which forms the basis for Mr. Gilman's defamation claims here:

> The *Journal*'s editorial also seeks to disparage the cases my office brought against Marsh & McLennan for a range of financial and business crimes.  The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted.  The judge found that certain evidence that should have been turned over to the defense was not.  (The cases were tried after my tenure as attorney general.)  Unfortunately for the credibility of the *Journal*, the editorial fails to note the many employees of

> Marsh who have been convicted and sentenced to jail terms, or that
> Marsh's behavior was a blatant abuse of law and market power:
> price-fixing, bid-rigging, and kickbacks all designed to harm their
> customers and the market while Marsh and its employees pocketed
> the increased fees and kickbacks.  Marsh as a company paid an $850
> million fine to resolve the claims and brought in new leadership.  At
> the time of the criminal conduct, Jeff Greenberg, Hank Greenberg's
> son, was the CEO of Marsh.  He was forced to resign.

*Id.*  Mr. Spitzer then offers a two-paragraph conclusion in which he returns to his broad theme

that denial by "voices in the corporate world" of any role for government in regulating the

marketplace is unhealthy for us as a society.  Mr. Gilman is *not* named anywhere in the piece,

whether in the single paragraph concerning Marsh or elsewhere.

### III.    EVENTS FOLLOWING PUBLICATION

On October 27, 2010, Mr. Gilman filed suit against his former employer, alleging ERISA

and related claims arising from his dismissal.  As the Court is aware (because that case and this

one have been designated "related" and jointly reassigned), Mr. Gilman has alleged in his

amended pleading in that case that Mr. Spitzer conspired to use his investigation of Marsh as

leverage to secure a lucrative job for his "friend," Michael Cherkasky (the two had both worked

in the Manhattan D.A.'s office in the 1990s), and that Mr. Spitzer forced the Board of Directors

of Marsh to appoint Mr. Cherkasky as its president and CEO in October 2004.  *See* Answ. Ex. 12

¶¶ 39-47.  According to Mr. Gilman, in return for the job, Mr. Cherkasky agreed to "offer up"

innocent employees such as Mr. Gilman for criminal prosecution to help Mr. Spitzer secure

victory in the 2006 gubernatorial election.  *See id.*

In January 2011, some five months after Mr. Spitzer authored the piece now at issue, the

State announced it would withdraw its appeal from the order vacating Mr. Gilman's conviction

and dismiss its case against him, rather than retry it.  Compl. ¶ 20; *see also* Answ. Ex. 12 ¶ 80.

In dismissing the case, the State indicated that, given the substantial resources already expended

on the prosecution, a re-trial would not be an efficient use of prosecutorial resources.  Answ.

Ex. 11 (transcript of Jan. 11, 2011 proceedings) at 2:16-24.  Thereafter, Mr. Gilman's pending

appeal from his conviction was dismissed as moot.  *People v. Gilman*, 80 A.D.3d at 542.

## IV.   THE PRESENT LAWSUIT

Eight months after the State announced it would not retry him and the appellate

proceedings arising from his conviction were mooted, and shortly after he filed amended

pleadings in his case against Marsh to allege that it and its CEO had conspired with Mr. Spitzer

to prosecute him, Mr. Gilman filed the present action against Mr. Spitzer and *Slate.com*.  Neither

Mr. Gilman nor any of his representatives ever complained to Mr. Spitzer or *Slate.com* about the

piece in the year prior to filing suit—there was no retraction demand, no request for a correction

or clarification, nor even a letter to the editor.  Counterclaim ¶ 49.

Mr. Gilman's defamation claims are based on two portions of a single sentence in a

paragraph from Mr. Spitzer's piece, each of which Mr. Gilman asserts is defamatory (the

challenged phrases are numbered in brackets and underlined in the following):

> The *Journal*'s editorial also seeks to disparage the cases my office
> brought against Marsh & McLennan for a range of financial and
> business crimes.  **The editorial notes that two of the cases against
> employees of the company were dismissed after the defendants
> had been convicted.  The judge found that certain evidence that
> should have been turned over to the defense was not.  (The cases
> were tried after my tenure as attorney general.)**  [1] Unfortunately
> for the credibility of the *Journal*, the editorial fails to note the many
> employees of Marsh who have been convicted and sentenced to jail
> terms, or that [2] Marsh's behavior was a blatant abuse of law and
> market power: price-fixing, bid-rigging, and kickbacks all designed
> to harm their customers and the market while Marsh and its
> employees pocketed the increased fees and kickbacks.  Marsh as a
> company paid an $850 million fine to resolve the claims and brought
> in new leadership.  At the time of the criminal conduct, Jeff
> Greenberg, Hank Greenberg's son, was the CEO of Marsh.  He was
> forced to resign.

9

Compl. ¶¶ 27-32 & Ex. A (emphases added).  Not even Mr. Gilman contends that the two

allegedly defamatory statements, standing alone, are of and concerning him.  Rather, Mr. Gilman

alleges that the immediately preceding sentences (emphasized in bold type) are of and

concerning him.  *Id.* ¶ 25 (alleging that any reader who "followed the cases in the newspaper, or

was aware of the charges against Marsh and its employees at all could readily identify

Mr. Gilman as one of the two employees at issue," because he was one of "the two former Marsh

employees who had their convictions vacated").  Mr. Gilman alleges that, notwithstanding this

reference to his conviction being *dismissed*, these same readers would have understood

subsequent references to wrongdoing by Marsh and its employees as also referring to him,

*id.* ¶¶ 1, 27-35, 43, and that these later passages thereby falsely charge him with criminal

wrongdoing, *id.* ¶¶ 38, 43.  Mr. Gilman seeks $60 million in damages, including punitive

damages.  *Id.* at p. 11.  As Defendants demonstrate below, however, Mr. Gilman's Complaint

fails to state a claim on which relief may be granted for at least two independent reasons.

## ARGUMENT

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is governed by

the same standard as a motion pursuant to Fed. R. Civ. P. 12(b)(6), and the Court thus must

accept the allegations of the non-movant's pleading as true, and should grant the motion only if it

is clear that the non-movant cannot prove a set of facts that would entitle him to relief.  *Nat'l*

*Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs*, 850 F.2d 904, 909 n.2 (2d Cir. 1988); *Rolon v.*

*Henneman*, 443 F. Supp. 2d 532, 535 (S.D.N.Y. 2006).  In adjudicating such a motion, the Court

may also consider "documents that are attached to, incorporated by reference in, or integral to

the complaint; and it may also consider matters that are subject to judicial notice."  *Byrd v. City*

*of New York*, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005); *accord Staehr v. Hartford Fin.*

*Svcs. Grp., Inc.*, 547 F.3d 406, 424-26 (2d Cir. 2008) (holding that "matters judicially noticed by the District Court are not considered matters outside the pleadings" and affirming dismissal under Rule 12(b)(6) where district court considered state court complaints and state regulatory filings).[6]

## I. APPLICABLE LAW STRONGLY FAVORS EARLY DISMISSAL OF DEFECTIVE DEFAMATION CLAIMS

Courts in this Circuit "have not hesitated" to grant dispositive motions in defamation cases, recognizing that the "'threat of being put to a defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself.'" *Chaiken v. VV Publishing Corp.*, 907 F. Supp. 689, 695 (S.D.N.Y. 1995) (quoting *Karaduman v. Newsday*, 51 N.Y.2d 531, 543 (1980)), *aff'd*, 119 F.3d 1018 (2d Cir. 1997); *see also, e.g., Cardillo v. Doubleday & Co.*, 366 F. Supp. 92, 94-95 (S.D.N.Y. 1973) ("[f]rivolous libel suits should be dismissed summarily to avoid the 'chilling effect' on free speech that the requirement of an expensive and extensive defense would require"), *aff'd*, 518 F.2d 638 (2d Cir. 1975). Indeed, our courts have remained especially "cognizant" of the importance of adjudicating potentially dispositive issues of law prior to trial "in the interests of protecting first amendment rights of media defendants."  *Machleder v. Diaz*, 538 F. Supp. 1364, 1373 (S.D.N.Y. 1982); *accord Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 640-41 (S.D.N.Y. 1995), *aff'd sub nom Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001).  These principles apply to the present defamation action, which arises from published commentary addressing matters of substantial public concern.

---

[6]     *See also, e.g., Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (in connection with motion to dismiss, court took judicial notice of complaint in separate lawsuit as a public record); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (upholding dismissal under Rule 12(b)(6) and noting that "courts routinely take judicial notice of documents filed in other courts"); *Piazza v. Florida Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 677-78 (S.D.N.Y. 2011) (noting that standards of review for Rule 12(c) motions are same as those for Rule 12(b)(6) motions and taking judicial notice of state administrative ruling for purposes of deciding Rule 12(c) motion).

## II.   THE FIRST CHALLENGED STATEMENT IS NOT ACTIONABLE AS A MATTER OF LAW BECAUSE IT CANNOT REASONABLY BE UNDERSTOOD TO BE OF AND CONCERNING PLAINTIFF

In the law of defamation, unless the challenged statement is "of and concerning the plaintiff," no cause of action will lie.  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006); *see also, e.g.*, *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (same), *aff'd*, 29 F. App'x 676 (2d Cir. 2002); *Brady v. Ottaway Newspapers, Inc.*, 445 N.Y.S.2d 786, 788 (2d Dep't 1981) (it is essential element of cause of action "that the allegedly defamatory comment refer to the plaintiff").  This limitation on defamation claims is not only a common law prerequisite, but also a constitutional imperative.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 288-92 (1964) (verdict based on libelous statement that did not refer to plaintiff held "constitutionally defective"); *Kirch*, 449 F.3d at 400 n.3.

Furthermore, both at common law and under the First Amendment, whether the challenged statement reasonably can be understood as of and concerning the plaintiff is a question of law for the Court, and one that "should ordinarily be resolved at the pleading stage." *Church of Scientology Int'l v. Behar*, 238 F.3d at 173; *see also, e.g., Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005); *Carlucci v. Poughkeepsie Newspapers, Inc.*, 57 N.Y.2d 883, 885 (1982); *Sullivan*, 376 U.S. at 258 (rejecting jury determination that challenged publication was "of and concerning" plaintiff despite testimony of trial witnesses who said that "they read . . . statements as referring" to plaintiff); *Coles v. Washington Free Weekly*, 881 F. Supp. 26, 33 (D.D.C. 1995) (whether publication is "of and concerning" plaintiff is for court to determine in first instance) (citing *Sullivan*, 376 U.S. at 288).

In making this determination, the Court is to be "guided not only by the meaning of the words as they would be commonly understood, but by the words considered *in the context of* their publication."  *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (emphasis added); *see*

*also, e.g.*, *Bordoni v. New York Times Co.*, 400 F. Supp. 1223, 1228 (S.D.N.Y. 1975) (court must not "fragmentize and dissect" the challenged publication but instead must "read it as a whole and in context").  As the New York Court of Appeals has explained, "[i]n analyzing the words in order to ascertain whether a question of fact exists for resolution upon trial, the court will not pick out and isolate particular phrases but will consider the publication as a whole.  The publication will be tested by its effect upon the average reader.  The language will be given a fair reading and the court will not strain to place a particular interpretation on the published words."  *James v. Gannett Co.*, 40 N.Y.2d 415, 419-20 (1976) (citations omitted).[7]

In this case, Mr. Gilman's first defamation claim is based on the first clause of the challenged sentence:

> The *Journal*'s editorial also seeks to disparage the cases my office brought against Marsh & McLennan for a range of financial and business crimes.  **The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted.  The judge found that certain evidence that should have been turned over to the defense was not.  (The cases were tried after my tenure as attorney general.)**  [1] <u>Unfortunately for the credibility of the *Journal*, the editorial fails to note the many employees of Marsh who have been convicted and sentenced to jail terms</u> . . . .

Compl. ¶¶ 27-32 & Ex. A (emphases added).  Mr. Gilman alleges that the same readers who would have understood that the introductory passage in bold referred to him also would have understood "that Mr. Spitzer was referring to Mr. Gilman in his defamatory statements."

---

[7]     New York law governs Plaintiff's defamation claim where, as here, he alleges damage to his professional reputation, his professional life was centered in New York, Defendants are located in New York, the allegedly defamatory communication was published in New York to a nationwide audience, and the publication concerns New York governmental action taking place in New York.  *See, e.g., In re State Street Bank & Trust Co.*, 772 F. Supp. 2d 519, 558-59 (S.D.N.Y. 2011) (federal court sitting in diversity applies forum state's choice of law rules and New York courts apply multi-factor "most significant relationship" test to claim involving multi-state defamation); *Condit v. Dunne*, 317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004) (same).  Because the "of and concerning" requirement is, as noted, of constitutional dimension, however, it is necessarily an element of the claim regardless of state law.

Compl. ¶ 25.  This leap in logic, however, is manifestly unreasonable as a matter of law and common sense in light of the content and context of the passage considered as a whole.

Simply put, a reader who understood from the introductory passage that Mr. Gilman was one of the two Marsh employees who had their cases dismissed could not then reasonably have believed that Mr. Gilman was also one of the Marsh employees Mr. Spitzer next said had "been convicted and sentenced to jail."  The two passages simply cannot reasonably be read together to refer to the same person, as a matter both of grammar and of logic.  The statement at issue is plainly there to tell readers that—notwithstanding the fact that convictions of two Marsh employees had been overturned (a fact that the Wall Street Journal had invoked in its editorial to criticize Mr. Spitzer's investigation of the insurance industry)—there remained other Marsh employees who, at the time of the piece's publication, had been convicted of criminal wrongdoing.  Put differently, no reasonable person would read this paragraph and thereafter believe *both* that Mr. Gilman obtained dismissal of the charges against him *and* that Mr. Gilman was convicted and jailed on the charges.  Accordingly, the first challenged statement is not "of and concerning" Mr. Gilman as a matter of law.  *E.g.*, *Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. at 1157, 1164 (S.D.N.Y. 1992) (dismissing claim where plaintiff "failed to allege a reasonable connection between itself and the alleged libel"), *aff'd sub nom Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001).[8]

---

[8]      Alternatively, if it could reasonably be said that a reader of Mr. Spitzer's piece would have thought the reference to persons being "convicted and sentenced to jail terms" included Mr. Gilman, any defamatory sting was excised by the preceding sentences, which, according to Mr. Gilman's own allegation, made clear that the case against him actually was dismissed subsequent to the conviction.  *See also infra* § III.B (explaining why, if passage could be understood to have meaning alleged, then paragraph is privileged fair and true report of judicial proceeding).

14

**III.   THE SECOND CHALLENGED STATEMENT IS NOT ACTIONABLE AS A MATTER OF LAW**

    **A.   The Second Challenged Statement, Which Is About Marsh, Cannot Reasonably Be Understood To Be Of And Concerning Plaintiff As A Matter Of Law**

        In the second challenged statement, Mr. Spitzer expressly references the behavior of "Marsh"—a company:  "Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks."  Compl. Ex. A at 2.  This sentence is followed immediately by the observation:  "Marsh as a company paid an $850 million fine to resolve the claims and brought in new leadership.  At the time of the criminal conduct, Jeff Greenberg, Hank Greenberg's son, was the CEO of Marsh.  He was forced to resign."  In short, the *only* one of Marsh's 50,000 employees referenced in connection with the challenged statement is Jeffrey Greenberg.[9]

        Precisely because the second challenged statement on its face accuses Marsh *as a company* of wrongdoing, and refers only generically to its "employees" as having benefitted therefrom, this statement cannot reasonably be understood as of and concerning Mr. Gilman even in the *absence* of the introductory passage making clear that the charges against him had been dismissed.  In the oft-cited case of *Provisional Gov't of Republic of New Afrika v. American Broad. Cos.*, 609 F. Supp. 104 (D.D.C. 1985), for example, co-presidents of an organization alleged they had been defamed by a news broadcast that linked the organization over which they presided "'to a pattern of criminality and terrorism.'"  *Id.* at 106-08; *see also id.* at 107 (organization was "'part of a complex pattern of racketeering . . . whose activities range from running drugs and prostitution rings to preaching revolution'") (quoting broadcast).  The court

---

[9]    *See* Marsh & McLennan Companies, Inc. SEC Form 10-Q (Nov. 9, 2010) at 35 (stating number of employees), *available at* http://www.sec.gov/Archives/edgar/data/62709/000119312510254061/d10q.htm.

dismissed the claims brought by the co-presidents because the broadcast did not identify *them* as

engaging in the criminal conduct; even though the news report did not reflect well on the

organization plaintiffs led, it was nevertheless not "of and concerning" them as a matter of law.

As the court explained:

> Defamation is personal . . . .  Allegations of defamation by an
> organization and its members are not interchangeable.  Statements
> which refer to individual members of an organization do not
> implicate the organization.  By the same reasoning, statements which
> refer to an organization do not implicate its members.

*Id.* at 108 (citations omitted) (cited with approval in, *inter alia*, *Friends of Falun Gong v. Pacific*

*Cultural Enterprise, Inc.*, 288 F. Supp.2d 273, 282 (E.D.N.Y. 2003) (individual practitioners of

Falun Gong could not maintain defamation action based on statements about conduct of "Falun

Gong" or unnamed "practitioners" of it), *aff'd*, 109 Fed. App'x 442 (2d Cir. 2004)); *see also Kirch*,

449 F.3d at 399-400 (plaintiff corporation, even though it was American "face" of German

company, could not state defamation claim for statements questioning solvency of German

affiliate); *Algarin v. Wallkill*, 421 F.3d 137, 102 (2d Cir. 2005) (report critical of 25-employee

police department not "of and concerning" plaintiff-officers where perpetrators of alleged

misconduct not identified by name); *Abramson v. Pataki*, 278 F.3d 93 (2d Cir. 2002) (affirming

dismissal where "repeated references to corruption among Javits Center workers," a group

totaling more than one thousand, did not "directly or impliedly identif[y]" plaintiffs); *Fulani v.*

*New York Times Co.*, 260 A.D.2d 215, 215-16 (1st Dep't 1999) (affirming dismissal where,

although individual plaintiff was identified by name in article as member of organization,

allegedly defamatory statement expressly was about organization, and therefore no reasonable

reader could have understood it to be "of and concerning" individual plaintiff) (citing, *inter alia*,

*Provisional Gov't*, 609 F. Supp. at 108).[10]

This principle applies with all the more force here precisely because, according to Mr. Gilman, reasonable readers understood from the introductory passage that he was one of two Marsh employees against whom criminal charges had been *dismissed*. Simply put, no reasonable reader possessing that knowledge would simultaneously have understood Mr. Spitzer as saying, in the next breath, that Mr. Gilman was one of the *other* referenced "employees." *Compare Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 173-75 (E.D.N.Y. 2006) (where press release regarding settlement included statement by defendant regarding "misconduct" by "former executives" and release included link to document that referred by name to plaintiff former executive and included specific allegations of wrongdoing by him, plaintiff had sufficiently alleged defendant's statement was "of and concerning" him) *with Lines v. Cablevision Sys. Corp.*, 2005 WL 2305010 (E.D.N.Y. Sept. 21, 2005) (where press release announced dismissal of 14 employees for misconduct but named only one, unnamed dismissed employee could not properly allege release was "of and concerning" him) *and Cardone v. Empire Blue Cross & Blue*

---

[10]       This well-established principle has been applied uniformly across jurisdictions to reject such claims in cases involving nearly every conceivable juxtaposition of an allegedly defamatory statement, an organization, and a party related in some fashion to the organization. *See, e.g., Diaz v. NBC Universal, Inc.*, 337 F. App'x 94 (2d Cir. 2009) (employees of law enforcement agency could not maintain defamation action based on statement that "three quarters of [department]" had been convicted of wrongdoing); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 302 (4th Cir. 2008) (government contractor cannot state claim for defamation based on statement it employed mercenaries who fought for racist regime as well as for brutal dictator because statements concerned "*individuals currently employed by the contractor*[ ]" and not plaintiff contractor itself) (emphasis in original); *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (investors in corporation cannot claim publication defamed them when publication "dealt exclusively with [corporation] as business organization"); *McBride v. Crowell-Collier Publ'g Co.*, 196 F.2d 187, 189 (5th Cir. 1952) (plaintiff, who was identified in article as sole owner of company, cannot state defamation claim based on article that is defamatory of company because "nothing in th[e] reference [to plaintiff] makes any accusation or charge of any kind against him"); *RE/MAX Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 894-95 (N.D. Ohio 2003) (dismissing defamation claim by RE/MAX franchisor predicated on implication that allegedly improper tactics attributed to its agents would be reasonably understood to have been "'endorsed and propagated by RE/MAX'") (citation omitted); *Norman v. Borison*, 994 A.2d 1019, 1029 (Md. Ct. Spec. App. 2010) (company owner cannot state defamation claim based on statements concerning allegedly fraudulent business practices of fellow owners because plaintiff "cannot lump the allegedly defamatory comments made about other individuals into a 'common pot'"); *Willis v. United Family Life Ins.*, 487 S.E.2d 376, 379 (Ga. Ct. App. 1997) ("Even express mention of one's name with another accused of misconduct . . . does not constitute defamation, and such a complaint is subject to dismissal.").

*Shield*, 884 F. Supp. 838 (S.D.N.Y. 1995) (where news release acknowledged investigation of corporate wrongdoing but did not refer to any particular employee, CEO could not succeed on defamation claim on theory that, as person ultimately responsible for company, readers would have understood him to be target of investigation).  Indeed, if Mr. Gilman's contention were accepted, no news organization could ever report the wrongdoing of a corporation without incurring potential liability to each of its employees, an unworkable proposition that, as the cases cited above demonstrate, the courts repeatedly have rejected.[11]

     In the end, no matter how much Mr. Gilman strains to link the second allegedly defamatory statement to himself, he cannot overcome the fact that it is about a company, not him.  What is more, Mr. Spitzer candidly and expressly made readers aware that the cases against two Marsh employees were dismissed, a disclosure that, according to Mr. Gilman, readers would have understood referred to him.  Accordingly, even if the piece were capable of conveying a defamatory meaning about Marsh employees generally or Mr. Greenberg (the only employee mentioned by name) in particular, this meaning cannot be "of and concerning" Mr. Gilman as a matter of law.

---

[11]    It is beyond dispute that, to the extent Marsh benefited financially from the scheme, its employees did so as well, "pocketing" increased compensation, and this is particularly so as to senior executives such as Mr. Gilman, who expressly alleges that he was personally responsible for generating a significant portion of Marsh's profits. Compl. ¶¶ 4, 7-8.  In hyperbolically referring to "kickbacks," Mr. Spitzer was doing no more than echoing Judge MacMahon of this Court, sitting by designation with the Second Circuit, when, with reference to this very scheme, she observed that "'[c]ontingent commissions' is a euphemism for kickbacks—insurance brokers would receive payments from insurers for steering business their way." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 408 (2d Cir. 2008).  Mr. Gilman's attempt to construe this passage as somehow charging him with personally having lined his own pockets with illegal payments from insurance carriers simply is not reasonable.  *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (holding that, construed in context, term "blackmail" was hyperbolic reference to plaintiff developer's negotiating position, not accusation of criminal offense); *G&R Moojestic Treats, Inc. v. Maggiemoo's Int'l, LLC*, 2004 WL 1172762, at *2 (S.D.N.Y. May 27, 2004) (given context, defendant's use of "extortion" constituted "rhetorical hyperbole," not accusation of criminal conduct).

**B.      The Second Challenged Statement Is In Any Event Privileged As A Fair And True Report Of An Official Proceeding**

That the second challenged statement cannot reasonably be understood as "of and concerning" Mr. Gilman is dispositive of his claim.  But this claim is defective for an additional reason:  Even if one could reasonably construe the second statement as being about him, it would in that event constitute a privileged fair and true report of the judicial proceeding against and/or involving him.  Accordingly, as a matter of law, the second challenged statement could not form the basis of a defamation claim.

More specifically, Section 74 of New York's Civil Rights Law provides, in relevant part, that:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding.

This privilege "is absolute, and [cannot be] defeated by the plaintiff's allegations of malice or bad faith."  *Pelayo v. Celle*, 270 A.D.2d 469, 469 (2d Dep't 2000).  Where the record of the relevant proceeding is before the Court, whether the statement at issue in a given case is privileged is an issue of law.  *See, e.g.*, *Easton v. Public Citizens, Inc.*, 1991 WL 280688, at *2 (S.D.N.Y. Dec. 26, 1991), *aff'd*, 969 F.2d 1043 (2d Cir. 1992) (Table); *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67-68 (1979).

A report is "fair and true" within the meaning of the statute if it accurately conveys the gist of what public officials and other participants in a judicial or other official proceeding were saying, even when the statements accurately conveyed are themselves false.  *See Holy Spirit*, 49 N.Y. 2d at 67; *Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 233 (3d Dep't 1992) ("The case law has established a liberal interpretation of the 'fair and true report' standard . . . so as to provide broad protection to news accounts of judicial or other official proceedings.").  In fact, "it is

19

enough that the substance of the article be accurate" for the privilege to apply; "the exact words of every proceeding need not be given if the substance be substantially stated." *Geiger v. Town of Greece*, 311 F. App'x 413, 417 (2d Cir. 2009) (quoting *Holy Spirit*, 49 N.Y.2d at 67) (further holding that newspaper report was privileged under Section 74 although it "use[d] more colorful language" than state Attorney General's press release upon which it was based); *see also Gonzalez v. Gray*, 69 F. Supp. 2d 561, 570 (S.D.N.Y. 1999) (defendant's statements in news broadcast about plaintiff doctor that "[t]his guy had killed her" and "[h]e lied to her" were "fair and true" summaries of medical malpractice lawsuit against plaintiff doctor arising from defendant's wife's death), *aff'd*, 216 F.3d 1072 (2d Cir. 2000).

Once the privilege attaches, it can only be defeated by a showing that the statement at issue so mischaracterizes the allegations made in the context of an official proceeding that it cannot be considered to be "fair and true" within the meaning of the statute. Indeed, the New York Court of Appeals has instructed that, in determining whether a news report constitutes a "fair and true" rendition of an official proceeding:

> the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author. Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected.

*Holy Spirit*, 49 N.Y.2d at 68. Moreover, the determination of "'[w]hether or not a particular article constitutes unbalanced reporting is essentially a matter involving editorial judgment and is not actionable.'" *Gotbetter v. Dow Jones & Co.*, 259 A.D.2d 335, 336 (1st Dep't 1999) (citation omitted); *see also, e.g., Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 620 (2d Dep't 1994) (privilege applies even if report does not present plaintiff's "side" of proceeding).

In this regard, it is of no small moment that Mr. Gilman *falsely* alleges in his Complaint "that all allegations against him had been resolved in his favor" by the time Mr. Spitzer authored the piece in question in August 2010.  Compl. ¶ 21.  To the contrary, the criminal Indictment against Mr. Gilman—and against his co-defendant Edward McNenney—for bid-rigging remained pending in August 2010.  Although the original judgment of *conviction* had been vacated a few weeks earlier, the Indictment had not been dismissed.  Indeed, the State took an appeal from the order vacating the convictions and could in any event have retried Mr. Gilman and Mr. McNenney on that count of the Indictment.  These proceedings were not brought to a close until January 2011, five months *after* the piece was published.  *See* Answ. Ex. 11; *People v. Gilman*, 80 A.D.3d at 542.  Consequently, insofar as Mr. Spitzer's piece can be said to relate to Mr. Gilman at all, the criminal proceedings against him remained on-going at the time it was published.  By the same token, the civil lawsuit against Marsh arising out of misconduct in which Mr. Gilman and others participated *had* been resolved by the time the piece was published—by Marsh admitting wrongdoing and expressly agreeing to stop, among other fraudulent practices, the precise bid-rigging scheme executed by Mr. Gilman and his colleagues.  Answ. Ex. 6 (Jan. 30, 2005 Settlement Agreement) ¶ 12.

And what specifically did Mr. Spitzer say in his piece about the judicial proceedings his office had initiated (again, assuming *arguendo* that the challenged statement reasonably could be understood to refer to Mr. Gilman in the first instance)?  Mr. Spitzer said simply that the cases initiated by his office against Marsh involved the company's "blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks."  Compl. Ex. A at 2.  So far as these statements can be said to relate to Mr. Gilman at all—an assumption

at odds with the plain meaning of the words "Marsh's behavior"—they truly and fairly summarize the state of the criminal judicial proceedings pending against him as of August 2010. Put differently, Mr. Spitzer's summary precisely captures the "gist" of the State's then-pending criminal antitrust charge against him. *See, e.g.,* Answ. Ex. 10 (indictment alleges Donnelly Act violation based on bid-rigging and price-fixing motivated by contingent commissions); Answ. Ex. 2 at 6-46 (appeal brief describing State's theory of case and record evidence supporting it in appellate proceedings pending as of August 2010, which included allegations that Gilman personally participated in bid-rigging and price-fixing, which produced "kickbacks" in the form of contingent commissions).

Conversely, to the extent the statement is given its more natural reading as pertaining to the company rather than to Mr. Gilman or any other one person, it is an indisputably accurate summary of the civil suit against Marsh and the settlement it had reached. *See* Answer Exs. 5-6. Indeed, the very next sentence references "Marsh *as a company*," thereby making explicit that Mr. Spitzer was referring to the civil action against Marsh and removing any reasonable doubt on the reader's part as to the collective nature of the conduct described in the previous sentence.

This is precisely the type of summary of the allegations made in a judicial proceeding that is protected from liability pursuant to Section 74.  For example, in *Mulder v. Donaldson, Lufkin & Jenrette*, 161 Misc. 2d 698, 704-05 (N.Y. Sup. Ct. N.Y. Cnty. 1994), *aff'd*, 208 A.D.2d 301 (1st Dep't 1995), the plaintiff employee had initiated wrongful termination arbitration proceedings against his employer after he had reported misconduct and was fired.  When the arbitrator ruled in favor of the former employee, the *Wall Street Journal* quoted a representative of the employer as saying that the employee had been fired for poor performance, not his whistle-blowing.  The *Journal* also included in its story the outcome of the arbitration.  *Id.* at

22

705.  The employee sued for defamation, but the court granted the *Journal*'s motion to dismiss

based on Section 74, holding that the article as a whole presented a fair and true report of the

proceeding.  *Id.* at 705-06 (observing that language in newspaper article was "an almost verbatim

description of the contentions made by [the employer] in the arbitration proceeding.  The

question is not whether the statement is 'true.'  The question is whether it is a substantially

accurate description of the claims made in the arbitration proceeding, and the answer is yes.").

Similarly, in *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, 2009 WL

4547792 (E.D.N.Y. Dec. 1, 2009), the plaintiff sued over a newspaper article that quoted an

attorney regarding the allegations made in ongoing litigation.  The court simply compared "the

statement in the *Newsday* article to the allegations in the complaint," and held that the quoted

statement was absolutely privileged under Section 74 because the quoted attorney "was 'merely

restating his client's position' in the action."  *Id.* at *17 (citation omitted).

There is no factual or legal basis on which Mr. Gilman can divest Defendants of the same

privilege in this case:  Mr. Spitzer's one-sentence summary of the Marsh-related cases his office

initiated was substantially accurate as regards the contours of the criminal charge against

Mr. Gilman that was pending in August 2010 when the piece was published as well as the civil

proceeding against Marsh based on conduct by Mr. Gilman and his colleagues—again, assuming

in the first instance that anyone could reasonably think that the published statement was actually

about Mr. Gilman at all.  As a result, the second challenged statement is absolutely privileged

under Section 74, and the defamation claim based on it must be dismissed for this additional,

independent reason.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion for judgment on the pleadings, dismiss Plaintiff's Complaint in its entirety, and award

them such other and further relief as the Court deems just.


Dated:  November 1, 2011                    Respectfully submitted,

                                            LEVINE SULLIVAN KOCH & SCHULZ, LLP

                                            By:___s/Jay Ward Brown_____
OF COUNSEL:                                     Lee Levine, *pro hac vice*
                                                Jay Ward Brown, Bar No. JB-4376
Eric Lieberman                                  Katharine Larsen, Bar No. KL-6153
James A. McLaughlin                         1050 Seventeenth Street, NW, Suite 800
THE WASHINGTON POST COMPANY                 Washington, DC  20036
1150 Fifteenth Street, NW                   Telephone:  (202) 508-1100
Washington, DC 20071-7301                   Facsimile:  (202) 861-9888
Telephone:  (202) 334-6000                  llevine@lskslaw.com
Facsimile:  (202) 334-5075                  jbrown@lskslaw.com
mclaughlinj@washpost.com                    klarsen@lskslaw.com
liebermane@washpost.com

                                            *Counsel for Defendants/Counterclaimants*

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Support of Defendants'

Motion for Judgment on the Pleadings was served via the Court's CM/ECF system this 1st day

of November 2011 upon the following:

> Jeffrey L. Liddle
> James W. Halter
> LIDDLE & ROBINSON, L.L.P.
> 800 Third Avenue
> New York, NY 10022
> *Counsel for Plaintiff/Counterclaim Defendant*

s/Jay Ward Brown
Jay Ward Brown

25