UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                             :
WILLIAM GILMAN,                                     :

                              Plaintiff,     :         11-CV-5843 (JPO)

           -against-                   :         <u>MEMORANDUM</u>
                                                          :         <u>OPINION AND ORDER</u>
ELIOT SPITZER and                          :
THE SLATE GROUP, LLC,                 :

                             Defendants.  :
-------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

       This is an action for defamation based on an article written by Eliot Spitzer and published in the online magazine *Slate*. The article addressed, among other things, an investigation of Marsh & McLennan Companies and certain of its employees by the office of then-New York Attorney General Spitzer. Defendants Spitzer and Slate have moved for judgment on the pleadings dismissing Plaintiff's defamation claim. For the reasons set forth below, Plaintiff's defamation claim is dismissed. The law of defamation, as bounded by the First Amendment's guarantee of free speech, does not allow this challenge to Spitzer's commentary.

       Plaintiff also has moved to dismiss Defendants' counterclaim, filed under New York's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute. Because the allegations do not meet the criteria set forth in that statute, Defendants' counterclaim is also dismissed.

       Accordingly, both Plaintiff's and Defendants' motions are granted, and both sides' claims are dismissed.

**I.     Background**

The facts that are relevant to these motions are essentially undisputed.[1]

A.

Plaintiff William Gilman was an employee of Marsh & McLennan Companies, Inc. ("Marsh") from 1976 to 2004.  He was experienced and respected in the insurance industry, and he was responsible for a significant portion of Marsh's annual profits.  (Compl. ¶¶ 7-8.)  In 2004, Eliot Spitzer, then the New York State Attorney General, announced an investigation by his office into Marsh's use of "contingent commissions"—fees paid by insurers to insurance brokers who place insurance business with the insurer.  Gilman's work for Marsh included negotiating contingent commissions.  Spitzer took the position that Marsh's use of contingent commissions was illegal.  (Compl. ¶¶ 9-11.)

In October 2004, Spitzer filed a civil complaint against Marsh, alleging fraud, antitrust, and other claims.  Shortly thereafter, Marsh replaced its chief executive officer.  (Compl. ¶¶ 12-13.)  In January 2005, Marsh entered into an agreement with Spitzer resolving the civil complaint.  (Compl. ¶ 14.)  That agreement required Marsh to pay $850 million into a fund to be paid to customers for contingent commissions they had paid to Marsh.  It provided that "[n]o portion of the Fund shall be considered a fine or a penalty." (Answer Ex. 6 at 3.)  The agreement also required Marsh to apologize for its conduct and to undertake certain "business reforms," including ending the practice of accepting contingent commissions.  (*Id.* at 5-9, 16.)

---

[1] The factual summary set forth here is based on the allegations in the parties' pleadings, documents incorporated in or integral to the pleadings, and certain documents that are subject to judicial notice. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).  For purposes of Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the Court assumes the truth of Plaintiff's factual allegations (but not the correctness of any legal conclusions) and draws reasonable factual inferences in Plaintiff's favor. *See id.* at 429-30.  Similarly, for purposes of Plaintiff's motion to dismiss Defendants' counterclaim pursuant to Rule 12(b)(6), the Court assumes the truth of Defendants' pertinent factual allegations and draws reasonable inferences in favor of Defendants. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  As noted, however, the facts implicated by both motions are largely undisputed.

In September 2005, Spitzer's office announced an indictment against Gilman and seven others, charging them with 37 counts relating to the contingent-commission investigation. (Compl. ¶ 15.) They were charged with one count of fraud, one count of restraint of trade and competition in violation of the Donnelly Act, and 35 counts of grand larceny. *See People v. Gilman*, 28 Misc. 3d 1217(A), 2010 N.Y. Slip Op. 51379(U), 2010 WL 3036983, at *1 (N.Y. Sup. Ct. 2010). The State's position was that the defendants had "devised and implemented an illegal anti-trust conspiracy to fraudulently obtain millions of dollars for Marsh and its accomplice insurance companies by rigging the market for excess casualty insurance." *Id.* A bench trial before New York Supreme Court Justice James A. Yates took place from April 2007 to February 2008. Gilman was convicted of one count of restraint of trade and competition in violation of the Donnelly Act. *Id.* at *2; Compl. ¶ 16. Some of the remaining counts were dismissed and Gilman was acquitted on all remaining counts. *Id.*

Gilman was initially sentenced to 16 weekends of incarceration on the one count on which he was convicted. (Compl. ¶ 20 n.2.) However, on July 2, 2010—while Gilman's appeal was pending and before he had begun serving his sentence—the trial judge vacated Gilman's conviction on the ground that exculpatory evidence had not been disclosed during his trial. As Justice Yates explained, "the verdict here rested firmly upon the testimony of [six witnesses], and yet, each one of them, after testifying with very favorable cooperation agreements, has, at times, before, during or shortly after trial, given sworn testimony discrediting, even contradicting, their trial testimony." *People v. Gilman*, 2010 WL 3036983 at *20. The judge concluded that "[w]hile each item of [undisclosed] evidence taken individually may present a reasonable possibility that the verdict would have been different, taken as a whole, the evidence raises not only a possibility, but a probability that its disclosure would have produced a different

result." *Id.* at *19. Justice Yates' decision to vacate Gilman's conviction followed a second trial against three of Gilman's co-defendants, which resulted in acquittals on all charges, and which also revealed the previously undisclosed exculpatory evidence. *Id.* Charges against two other Marsh executives were dismissed by the trial court before trial. (Compl. ¶ 18.)

Prior to Gilman's trial, 21 other individuals—Marsh executives and insurance carrier executives—had pleaded guilty to charges relating to the contingent-commission investigation. *People v. Gilman*, 2010 WL 3036983 at *1 n.4. According to the Complaint, each of these individuals received an adjournment in contemplation of dismissal or an unconditional discharge, and none received a sentence that included incarceration. (Compl. ¶ 19.)

The State initially filed an appeal from Justice Yates' October 2010 order vacating Gilman's conviction. However, in January 2011, the New York Attorney General's Office (then led by Attorney General Eric Schneiderman) dismissed the remaining charge against Gilman and withdrew its appeal. *People v. Gilman*, 80 A.D.3d 542 (1st Dep't 2011); Compl. ¶ 20; Answer Ex. 11.

B.

On August 13, 2010, the *Wall Street Journal* published an editorial with the headline "Eliot Spitzer's Last Admirer." The editorial primarily addressed then-Attorney General Andrew Cuomo's continuing prosecutions related to AIG and its former chairman, Hank Greenberg. It then turned to the Marsh matter:

> One would think that Mr. Cuomo would want to end the era of stonewalling [regarding AIG], especially after the defeat his office sustained last month on still another Spitzer-created prosecution. Manhattan Supreme Court Justice James A. Yates vacated the felony convictions of two former employees of Marsh & McLennan Companies because the Attorney General's office had failed to turn over potentially exculpatory evidence to the defense.

4

> Although prosecutors had earlier assured the court that "We don't want to be accused of hiding anything," Judge Yates found that the Attorney General's office had failed to turn over more than 700,000 pages of documents, plus deposition testimony from key witnesses.

(Compl. ¶ 22.)

Spitzer authored an article responding to the *Wall Street Journal* editorial, which was published on *Slate.com* on August 22, 2010. Spitzer's article begins with the following headline and introductory paragraph:

> **They Still Don't Get It**
>
> **Some people on Wall Street, and at the Wall Street Journal, speak as if the financial crisis never happened.**
>
> The art of the "big lie" is to repeat something often enough, and with a powerful enough megaphone, such that your distortions are not challenged. So it is with the *Wall Street Journal*'s obsession with attacking and misrepresenting the multiple cases that I brought against both AIG and its former chairman and CEO, Hank Greenberg.

After first addressing the AIG prosecutions pursued by his office, Spitzer then turns to the Marsh matter in the following paragraph:

> The *Journal*'s editorial also seeks to disparage the cases my office brought against Marsh & McLennan for a range of financial and business crimes. The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted. The judge found that certain evidence that should have been turned over to the defense was not. (The cases were tried after my tenure as attorney general.) Unfortunately for the credibility of the *Journal*, the editorial fails to note the many employees of Marsh who have been convicted and sentenced to jail terms, or that Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks. Marsh as a company paid an $850 million fine to resolve the claims and brought in new leadership. At the time of the criminal conduct,

> Jeff Greenberg, Hank Greenberg's son, was the CEO of Marsh. He was forced to resign.

(Compl. Ex. A.) Spitzer's article does not mention Gilman by name.

## II. Discussion

Jurisdiction of this matter exists pursuant to 28 U.S.C. § 1332.[2]

Gilman asserts a claim for defamation against Spitzer and Slate, alleging that Spitzer's article falsely accuses Gilman of criminal conduct, injures him in his trade, business, and profession, and was published with reckless disregard for the truth. Defendants have moved for judgment on the pleadings with respect to Gilman's claim on the grounds that the challenged statements (1) are not "of and concerning" Gilman, and (2) are privileged as a fair and true report of a judicial proceeding.

Defendants assert a counterclaim under New York's anti-SLAPP statute, contending that Gilman's lawsuit is an effort to silence advocacy in connection with a permit or license. Gilman moves to dismiss the anti-SLAPP counterclaim on the ground that the statute is inapplicable.

Each motion is addressed in turn.

### A.

Gilman claims that Spitzer and Slate are liable for defamation as a result of publishing the passage quoted above. Specifically, he alleges that two clauses in one sentence (italicized and numbered in brackets below) are false and defamatory; and that the context provided by the preceding sentences (underlined below) makes it clear that the defamatory statements are about Gilman:

> <u>The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted. The judge found that certain evidence that should have been turned</u>

---

[2] Plaintiff is a citizen of New Jersey; Defendants are citizens of Delaware and New York. The amount in controversy exceeds $75,000.

> over to the defense was not.  (The cases were tried after my tenure as attorney general.)   [1] ***Unfortunately for the credibility of the Journal, the editorial fails to note the many employees of Marsh who have been convicted and sentenced to jail terms***, or that [2] ***Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks.***

Defendants, having filed their Answer and Counterclaim, move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[3]  Defendants' principal argument is that neither of the challenged statements reasonably can be understood as "of and concerning" Gilman.

A claim for defamation requires that the challenged statement be "of and concerning" the plaintiff.  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).  In other words, it is essential "that the allegedly defamatory comment refer to the plaintiff."  *Brady v. Ottaway Newspapers, Inc.*, 445 N.Y.S.2d 786, 788 (2d Dep't 1981).  Although it is based on common law, the "of and concerning" requirement has a constitutional dimension, serving a role in protecting freedom of speech and of the press.  *See New York Times v. Sullivan*, 376 U.S. 254, 288-92 (1964); *Kirch*, 449 F.3d at 400 n.3; Robert D. Sack, *Sack on Defamation* §§ 2:9.1, 2:9.4[B] (4th ed. 2012).

Whether a challenged statement reasonably can be understood as of and concerning the plaintiff is a question of law for the Court, which "should ordinarily be resolved at the pleading stage."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).  In determining

---

[3] As an initial matter, Gilman argues that Defendants' motion is premature under Rule 12(c).  That Rule permits a party to make a motion for judgment on the pleadings "[a]fter the pleadings are closed."  Gilman contends that the "pleadings" are not "closed" because Gilman has not filed an answer to Defendants' counterclaim under the anti-SLAPP statute; instead, he has moved to dismiss that counterclaim.  The better interpretation of the Rule is that the "pleadings are closed" in the relevant sense when the *pertinent* pleadings are closed, and the existence of an open counterclaim in circumstances like those here—where the counterclaim seeks attorney's fees under an anti-SLAPP statute—does not preclude a Rule 12(c) motion.  *See, e.g.*, *Friends of Rockland Shelter Animals, Inc. v. Mullen*, 313 F. Supp. 2d 339, 345 (S.D.N.Y. 2004).  In any event, the result here would be the same if the Court treated Defendants' motion as a Rule 12(b)(6) motion or converted the motion to a Rule 56 motion.

whether the challenged words are susceptible of a defamatory meaning, "the court must not isolate them, but consider them in context, and give the language a natural reading rather than strain to read it as mildly as possible at one extreme, or to find defamatory innuendo at the other." *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 592 (1989).

Gilman is not referenced by name in the article, but that fact is not necessarily fatal to his claim: "[W]here the person defamed is not named in a defamatory publication, it is necessary, if it is to be held actionable as to him, that the language used be such that persons reading it will, in the light of the surrounding circumstances, be able to understand that it refers to the person complaining." *Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (quoting *DeBlasio v. North Shore Univ. Hospital*, 624 N.Y.S.2d 263, 264 (2d Dep't 1995)).

1.

The first statement challenged by Gilman is that "[u]nfortunately for the credibility of the *Journal*, the editorial fails to note the many employees of Marsh who have been convicted and sentenced to jail terms." Gilman does not suggest that the reference to "employees of Marsh," by itself, is sufficient to be "of and concerning" Gilman—nor could he. The courts have not allowed references to such large groups to support defamation claims by the group's unnamed members. *See Algarin*, 421 F.3d at 139 ("It is not possible to set definite limits as to the size of the group or class, but the cases in which recovery has been allowed usually have involved numbers of 25 or fewer." (quoting Restatement (Second) of Torts § 564A cmt. b)); *Sack on Defamation* § 2:9.4.

Gilman argues, rather, that a reasonable reader would understand the statement to be about him based on its context—specifically, the context provided by the preceding sentences regarding the dismissal of the two cases after conviction:

8

> <u>The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted. The judge found that certain evidence that should have been turned over to the defense was not.  (The cases were tried after my tenure as attorney general.)</u>  [1] ***Unfortunately for the credibility of the Journal, the editorial fails to note the many employees of Marsh who have been convicted and sentenced to jail terms . . . .***

The problem with Gilman's reading is that it is inconsistent with the natural reading of the passage.  As a matter of grammar and logic, a reader who understood the first three sentences to be about Gilman—and thus understood that his case had been dismissed—could not reasonably infer that *Gilman* was among the "many employees of Marsh who have been convicted and sentenced to jail terms."  Any suggestion that Gilman is referred to by the challenged statement is *undermined*, not supported, by the preceding passage.  In other words, no reasonable reader of the entire passage would come away from it thinking *both* that Gilman obtained dismissal of the charges against him *and* that Gilman was convicted and jailed on those charges.

To be sure, the Complaint alleges that although 21 other individuals were *convicted* in connection with the Marsh investigation—as a result of pleading guilty—none of them received a sentence that included incarceration.  (Compl. ¶ 19.)  If that is true, then the article's reference to "the many employees of Marsh who have been convicted and sentenced to jail terms" is simply inaccurate.  But it is not defamatory as to Gilman, because it cannot reasonably be read as "of and concerning" him.

2.

The second statement challenged by Gilman is the following:  "Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks."

This statement expressly refers to "Marsh" *as a company* as engaging in unlawful activity, and to "Marsh and its employees" as "pocket[ing] the increased fees and kickbacks." Courts have repeatedly held, particularly after *New York Times v. Sullivan*, that "[d]efamation is personal . . . . [S]tatements which refer to an organization do not implicate its members." *Provisional Gov't of Republic of New Afrika v. American Broad. Cos.*, 609 F. Supp. 104 (D.D.C. 1985); *see also Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*, 288 F. Supp. 2d 273, 282 (E.D.N.Y. 2003), *aff'd*, 109 Fed. App'x 442 (2d Cir. 2004); *Abramson v. Pataki*, 278 F.3d 93 (2d Cir. 2002); *Fulani v. New York Times Co.*, 260 A.D.2d 215, 215-16 (1st Dep't 1999). By themselves, the article's references to "Marsh" and "its employees" (numbering in the thousands) certainly are not "of and concerning" Gilman.

As with the first challenged statement, Gilman argues that the article's preceding references to the two dismissed cases sufficiently tie him to the second statement:

> The editorial notes that two of the cases against employees of the company were dismissed after the defendants had been convicted. The judge found that certain evidence that should have been turned over to the defense was not. (The cases were tried after my tenure as attorney general.) ***Unfortunately for the credibility of the Journal, the editorial fails to note . . . that*** [2] ***Marsh's behavior was a blatant abuse of law and market power: price-fixing, bid-rigging, and kickbacks all designed to harm their customers and the market while Marsh and its employees pocketed the increased fees and kickbacks.***

Again, however, the challenged statement is not *reasonably* understood as being about *Gilman*. If anything, the preceding sentences—by acknowledging that the charges against Gilman were dismissed—tend to *weaken* any inference that the subsequent statements encompassed Gilman in referring to the behavior of "Marsh" and "its employees." But in any event, the only reasonable understanding of the challenged statement is that it is "of and concerning" what it clearly refers

10

to: *Marsh* and *its employees*—referents that are far too large and generalized to serve as proxies for Gilman under the law of defamation, as bounded by the First Amendment.

Gilman argues alternatively that the challenged statement refers, at most, to the former Marsh employees who were "subject to prosecution"—a group numbering 20 individuals.[4] Gilman correctly points out that some courts have allowed defamation claims to proceed where a publication referred generally to a group numbering 25 people or fewer. *See, e.g.*, *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 313, 316 (S.D.N.Y. 1952). *But see Lines v. Cablevision Sys. Corp.*, 2005 WL 2305010 (E.D.N.Y. Sept. 21, 2005) (press release stating that 14 employees were dismissed for misconduct was not "of and concerning" unnamed employee).

This argument is unavailing because it is not supported by the language of the passage itself. As noted, the challenged statement refers broadly to "Marsh" and "its employees," not to the subset of employees who were subject to prosecution. The law does not permit a defamation plaintiff to impose such an extraneous gloss on the challenged language to artificially narrow the scope of its subject. As the Second Department has explained, "the group to which the allegedly defamatory comment refers must be isolated by the standards set forth or implied in the comment. . . . Imputation to the plaintiff will be evaluated in relation to the group as defined by the comment and not by the plaintiff's relationship to a smaller subset of the group defined." *Brady v. Ottoway Newspapers, Inc.*, 445 N.Y.S.2d 786, 793 (2d Dep't 1981); *accord Diaz v. NBC Universal, Inc.*, 337 Fed. App'x 94, 95 (2d Cir. 2009).

To be sure, an allegedly defamatory statement is to be read in context, not in a vacuum, and the plaintiff need not be named explicitly or targeted with mathematical precision to have a potential claim. Indeed, the very notion of allowing a *member* of a group to sue for defamation

---

[4] Eight employees of Marsh, including Gilman, were indicted. Of the 21 other individuals who pleaded guilty, 12 were Marsh employees. (Halter Decl. Exs. 1 & 2.)

on the basis of an allegedly defamatory statement about the *group* presupposes some degree of extraneous knowledge about the matter on the part of the reader.  Here, however, Gilman's effort to restrict the group referred to by the challenged statement to a convenient size is inadequately tethered to the statement's language and presupposes an artificially detailed understanding of the background facts on the part of the reader.

Because the challenged statements cannot reasonably be construed as "of and concerning" the plaintiff as a matter of law, Defendants are entitled to judgment dismissing Plaintiff's defamation claim.[5]

B.

Defendants Spitzer and Slate have asserted a counterclaim against Gilman under New York's anti-SLAPP statute, which provides:

> A defendant in an action *involving public petition and participation* . . . may maintain a[] . . . counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that:
>
> (a) costs and attorney's fees may be recovered upon a demonstration that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law . . . .

N.Y. Civ. Rts. Law § 70-a (emphasis added).  Despite its seemingly broad language, New York's anti-SLAPP law "is available only in relatively rare circumstances—notably rare as to press defendants." *Sack on Defamation* § 16:2.3 (footnote omitted).  That is because the crucial phrase "action involving public petition and participation" is expressly defined narrowly:

> An "action involving public petition and participation" is an action, claim, cross claim or counterclaim for damages that is brought by a

---

[5] Because Plaintiff's defamation claim fails as a matter of law, it is unnecessary to address Defendants' alternative argument that the second challenged statement is privileged as a fair and true report of a judicial proceeding.

> *public applicant or permittee*, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission.

N.Y. Civ. Rts. Law § 76-a(1)(a) (emphasis added). The phrase "public applicant or permittee," in turn, is defined as

> any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body, or any person with an interest, connection or affiliation with such person that is materially related to such application or permission.

N.Y. Civ. Rts. Law § 76-a(1)(b).

Thus, in order for an anti-SLAPP claim to exist under New York law: "1) there must be a public application or petition, 2) the public applicant or permittee of that application must file a lawsuit against a person [that] is 'materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission,' and 3) the lawsuit must be, at a minimum, substantially without merit." *Chandok v. Klessig*, 648 F. Supp. 2d 449, 460 (N.D.N.Y. 2009), *aff'd*, 632 F.3d 803 (2d Cir. 2011). "Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission." 632 F.3d at 819. Moreover, "[a] narrow construction of the anti-SLAPP law requires that a SLAPP-suit defendant must directly challenge an application or permission in order to establish a cause of action." *Guerrero v. Carva*, 779 N.Y.S.2d 12, 21 (1st Dep't 2004).

Defendants contend that Gilman is a "public applicant or permittee" under the statute because he "has applied for or obtained a . . . license . . . from [a] government body"—namely, an insurance license issued by the New York Department of Insurance. It is undisputed that Gilman has been licensed by the Insurance Department since 1976. Despite Herculean efforts,

however, Defendants cannot plausibly allege that Gilman's lawsuit is "*materially related to any efforts*" on the part of Spitzer or Slate to "*comment on . . . or oppose*" Gilman's insurance license.  Indeed, there is obvious tension between Defendants' position that Spitzer's article was commenting on or opposing Gilman's insurance licensure, on the one hand, and their position that the article was not "of and concerning" Gilman, on the other.

It is true, as Defendants point out, that it is Gilman's lawsuit, not Spitzer's article, that must "materially relate" to efforts to comment on or oppose Gilman's licensure.  But at bottom, there must *actually be* "efforts" on the part of Spitzer or Slate to comment on or oppose Gilman's licensure.  Defendants emphasize that some cases applying the New York statute have declined to require a strict nexus between the publication (or other efforts to comment or oppose) and the permit or license being commented on.  In fact, the New York courts appear to have taken differing approaches on this issue, and the New York Court of Appeals has not offered clear guidance on it.

What is clear, however, is that holding the anti-SLAPP statute applicable here would require a stretch of its language beyond that of prior decisions—and beyond a reasonable construction of the law.  Defendants cannot plausibly allege that Spitzer's article, or the underlying prosecutions themselves, were substantially―or even remotely―*about* Gilman's insurance licensure.  Rather, the prosecutions, and the article defending them, targeted alleged violations of law at a company that happened to be in the insurance business.  The fact that many of the company's employees, including Gilman, had insurance licenses was incidental to Spitzer's efforts.  It simply cannot be said that Spitzer's efforts were "commenting on" or "opposing" Gilman's licensure, or, derivatively, that Gilman's defamation lawsuit was "materially related" to any efforts to comment on or oppose Gilman's licensure.

Even the decisions allowing a broad construction of the anti-SLAPP law have involved circumstances fitting far more comfortably within the statutory language than those presented here. For example, in *Egiazaryan v. Zalmayev*, No. 11 Civ. 2670, 2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011), a Russian businessman who had moved to the United States filed a defamation action based on a series of publications which, among other things, explicitly called on federal agencies to deny him asylum. The defendant filed a counterclaim under New York's anti-SLAPP statute. Concluding that "a petition for asylum . . . is an application for 'permission to act'" under the statute, the court held that the defamation lawsuit could be construed as "materially related to . . . [the defendant's] alleged efforts to 'comment on, . . . challenge or oppose' any asylum application by [the plaintiff]." *Id.* at *12.

Similarly, in *Duane Reade, Inc. v. Clark*, 2 Misc 3d 1007(A), 784 N.Y.S.2d 920, 2004 WL 690191 (N.Y. Sup. Ct. N.Y. Cty. 2004), the court considered commentary relating to a building permit application. In that case, an individual had authored an advertisement objecting to a lighted drugstore sign, claiming that it would harm the neighborhood. After the drugstore sued the author for defamation, the author counter-sued under the anti-SLAPP law. The court allowed the author's anti-SLAPP suit to proceed because the advertisement was "reasonably targeted to make [the New York City Department of Buildings] aware of his concerns during the time it was reviewing permission for the sign." 2004 WL 690191, at *7.

In contrast to these cases, Spitzer's commentary cannot plausibly be deemed related to Gilman's insurance licensure, or to any other application for a government license or permission. Accordingly, the anti-SLAPP statute is inapplicable here and Defendants' counterclaim must be dismissed.

### III. Conclusion

For the foregoing reasons, Defendants' motion for judgment on the pleadings on Plaintiff's claim (Dkt. No. 16) is GRANTED; and Plaintiff's motion to dismiss Defendants' counterclaim (Dkt. No. 19) is GRANTED.

The Clerk of Court is directed to close this case.


SO ORDERED.

Dated: New York, New York
October 1, 2012

_____
J. PAUL OETKEN
United States District Judge